RANDOLPH v. ALLEN et al.

(Circuit Court of Appeals, Fifth Circuit. February 24, 1896.)

No. 205.

1. APPEAL—ASSIGNMENTS OF ERROR.

Assignments of error are necessary in appeals, as well as on writs of error; but they should be directed to the rulings of the court, and, where the decree appealed from is one confirming a master's report, the assignments should not be in the form of elaborate arguments in support of the contention that the court erred in sustaining the master's findings.

2. SAME—AMENDMENT OF TRANSCRIPT—CERTIORARI.

Presumptively the transcript filed in the appellate court is correct, and that court has no power, by certiorari, upon ex parte affidavits, to cause the record to be amended by inserting a paper which appellant claims was introduced before the master, but of which neither the master nor counsel for appellee has any recollection.

3. SAME—REVIEW—MASTER'S FINDINGS.

Where all the issues have been referred to a master to hear and decide, and his report is confirmed, after the overruling of exceptions thereto, an appellate court is required to treat his findings as so far correct as not to be disturbed, unless clearly in conflict with the weight of the evidence. Kimberly v. Arms, 9 Sup. Ct. 355, 129 U. S. 512, followed.

4. FRAUD—REPRESENTATIONS AS TO FINANCIAL STANDING.

A person about to enter into a contract with a stranger in a distant state, which required large advances of money, inquired of a member of a banking firm, doing business in the region of the stranger's residence, as to the latter's business character and responsibility. The banker made certain favorable statements, and also solicited and obtained for his firm the banking business connected with the transfer of the funds. *Held,* that the firm was under no obligation to make a voluntary disclosure of the fact of a considerable indebtedness to them by the stranger arising from his ordinary business transactions, when they had no reason to question his integrity or financial ability.

5. INSOLVENCY—PREFERENCES.

The giving of a mortgage by a failing debtor to secure one of his creditors, on condition that the latter shall pay a note held by another creditor, which condition is complied with, is not a diversion of funds, nor an unlawful delay or hindrance of other creditors, but the mortgage merely operates as a double preference, and is not forbidden by the laws of Texas. Sonnentheil v. Trust Co. (Tex. Civ. App.) 30 S. W. 945, followed.

6. MORTGAGES—SALE UNDER TRUST DEED—EMPLOYE AS TRUSTEE.

In Texas a mortgagee may act as trustee to sell under a mortgage to himself, and therefore an employé of a mortgagee may also be authorized in

the deed to act as trustee, and a sale by him will not be void merely because he acts by direction of his employer.

7. FRAUD—REPRESENTATIONS AS TO FINANCIAL STANDING—CONCEALMENT.

A representation by a member of a banking firm, upon inquiry by one about to enter into a contract with one of their customers, that a bond offered by the customer as a guaranty of his performance of the contract is a good bond, does not impose on the bankers any duty to voluntarily disclose the fact of an indebtedness of one of the bondsmen to them, where such indebtedness is not of a character to induce a belief on their part that its existence will injuriously affect the obligee; nor does the representation render it inequitable for the bankers to enforce their demand against the property of such bondsman before the claims of the obligee growing out of the contract are satisfied.

8. CONSTRUCTIVE TRUSTS—FOLLOWING MONEY INTO PROPERTY.

Where one advanced money to a cattle buyer, under a contract whereby the latter was to purchase and deliver cattle to him, and it afterwards appeared that he was being defrauded by the cattle buyer, *held* that, even if he elected to treat the money advanced as obtained by fraud, and the title thereto still in himself, and conceding that he would then have a right to follow the money into property purchased with it, he could not do so in respect to a herd of cattle which was purchased in part with other moneys. Litchfield v. Ballou, 5 Sup. Ct. 820, 114 U. S. 190, followed.

9. MORTGAGE FORECLOSURE—RIGHTS OF CREDITORS AS AGAINST EACH OTHER.

Whatever moral obligation a creditor, who has bought in property of his debtor on foreclosure under a mortgage to himself, may be under to another creditor to make some allowance on the balance of his indebtedness, because of a possible excess of value of such property over the price bid for it, he is under no legal obligation to do so; and where such other creditor claims a right in the property so acquired, and his conduct is such as to indicate future litigation with him, it is not unlawful or fraudulent, as against him, for the first-named creditor to stand upon his strict legal rights, and, by enforcing further liens against the debtor's property, obtain as great a margin as possible, so as to recoup himself, out of the possible profits thereof, for the legal and other expenses, and the growing interest account.

10. BANKS AND BANKING — COLLECTION OF DRAFTS — RESPONSIBILITY OF BANKERS.

The mere collection by bankers of drafts of their customer, and the placing of the money to his credit as a depositor, with the knowledge that it is advanced to him by another to enable him to buy and deliver cattle to such other, creates no implied obligation on the part of the bankers to exercise a supervisory control over the business of their depositor, so as to see that the money is properly applied by him. Bank v. Gillespie, 11 Sup. Ct. 118, 137 U. S. 411, distinguished.

11. GUARANTY—REPRESENTATIONS AS TO FINANCIAL RESPONSIBILITY.

In the face of a positive refusal of a banking firm to sign a bond guarantying the performance, by one of their customers, of a contract with a third party, it should not readily be inferred that they made such representations in respect to the character and financial responsibility of their customer as would impose upon them the same responsibility they would have incurred by signing the bond.

Appeal from the Circuit Court of the United States for the Northern District of Texas.

This is an appeal from a decree, rendered July 8, 1893, by the circuit court for the Northern district of Texas, overruling exceptions to the report of a master, and dismissing the bill of complaint. The defendants named in the bill are Heard, Allen & Floore, bankers, of Cleburne, Johnson county, Tex.; S. B. Allen and John W. Floore, members of said firm, sued individually; S. E. Moss, sued as claiming to be the purchaser of Allen's interest in the firm of Heard, Allen & Floore, and in the lands mentioned in the bill; Sam White; Sophia White; Andrew Green White; and William T. Hudson.

The bill charged that William T. Hudson, Sam White, and Heard, Allen & Floore formed and carried out a combination and conspiracy against complainant, his rights and property, and had "absolutely refused to pay and convey to complainant certain moneys, and certain cattle and the proceeds thereof, and to convey certain described lands claimed to be held fraudulently against the right and title of complainant, and which, in equity and good conscience, should be transferred to complainant." The averments of the bill are, in substance, that L. V. F. Randolph, of the city of Plainfield, state of New Jersey, in reliance upon certain alleged false representations, made by one W. T. Hudson, of Kopperl, Bosque county, Tex., at the time a depositor and customer of the banking firm of Heard, Allen & Floore, and in further reliance upon alleged false assurances of said firm, through S. B. Allen, to the effect that Hudson was financially able to perform a proposed contract, hereinafter referred to, and was a man of good character for honesty and integrity, and that a bond offered as security for the performance of said contract was perfectly good and safe, did, on May 8, 1885, enter into a contract for the purchase from W. T. Hudson of a large number of cattle, and accepted the bond referred to guarantying the performance by Hudson of the stipulations of the contract; that, by the contract, Hudson agreed to deliver to Randolph, on or before July 1, 1885, at Red Fork ranch, in the Indian Territory, 5,500 head of steer cattle, for which complainant agreed to pay $66,000; that $14,000 of such agreed price was paid, at the time of the execution of the contract, by draft upon a New York bank, and, about May 22, 1885, a second draft for $16,000 was paid upon presentation; that these drafts were collected through Heard, Allen & Floore, at their special solicitation; that the remainder of the purchase price was to be paid on the delivery of the cattle, and, moreover, the agreement provided, in the event of a total failure to perform, Hudson should pay and forfeit $24,000 as liquidated damages, and for a partial failure he should pay and forfeit $5 for each head undelivered. The sureties on the bond were B. F. Vinson, A. J. Hudson, George D. Hudson, John R. Haley, Sam White, and L. B. Hudson. In addition, the bill averred that the representations and inducements of Hudson and Heard, Allen & Floore, upon which complainant relied in making the contract, "were false, and, your orator believes, and so charges, were made to induce the contract by and through which your orator parted with his money." The bill further averred that, at the time of the making of the aforesaid representations by Heard, Allen & Floore, they were creditors of said Hudson in a large sum; that a part of this indebtedness was then overdue, and that the firm fraudulently concealed knowledge of such facts, which, if they had been made known, complainant would not have made the contract, and parted with his money in accordance with the terms thereof; that Hudson had been frequently indicted, prior to the said representations, for grave crimes and felonies, and, upon belief, complainant charged that Heard, Allen & Floore well knew of such indictments, and concealed their knowledge from complainant; that Allen, on May 25, 1885, in reply to a telegram which Randolph sent, a day or two following the second payment upon the contract, falsely stated that reports to Randolph of possible bad faith of Hudson were false, and that the cattle which were to be delivered under the contract were all bought, and would move about June 1st, and substantially reiterated the statements in a subsequent letter; that complainant, very soon after receipt of the telegram and letter from Allen, went to Texas, and personally investigated the progress being made by Hudson, and from Kopperl proceeded to Red Fork ranch, and there awaited the arrival of the cattle. It was averred that, about the 12th of June, Hudson started with about 3,000 head of cattle, ostensibly to make delivery under his contract, but on the way began to cut out and sell portions of the herd, and that, learning of this, Randolph hurried back to Texas and employed counsel to protect his interests; and the bill charged that, subsequent to the execution of the contract, "the parties to the contract had conveyed to one B. F. Hudson about sixty or seventy thousand dollars' worth of property," and L. B. Hudson has transferred his property to his wife, and caused her to make a conveyance to one Black, all with intent to hinder and delay and defraud complainant.

Specific averments are contained in the bill as to conveyances executed by Sam White in the latter part of July, 1885, to his wife and children, of about 2,000 acres of land, and, following said conveyances, on August 6th, White is

alleged to have executed a mortgage on the same land to Heard, Allen & Floore, and it is alleged that, on the next day, White and his wife and children executed another mortgage to said firm upon the same property, charged to be fraudulent, and that on said last-named date White also gave said firm a chattel mortgage upon 400 head of cattle. It was charged that Heard, Allen & Floore, in order to have a pretense of a claim upon which to base an incumbrance upon the White land, and with intent to hinder, delay, and defraud Randolph, and to protect White from process in a suit then anticipated to be brought by Randolph, did, about August 6, 1885, pay at the First National Bank of Cleburne a note for the sum of $3,480.24, made by W. T. Hudson to or for the benefit of one Mrs. Blair and said to bear the name of Sam White. The bill averred that, on August 14, 1885, Randolph instituted an action in the circuit court of the United States for the Northern district of Texas, sitting at Dallas, upon the contract and bond of May 8, 1885, and sued out a writ of attachment, which was levied upon lands claimed to be the property of the defendants, including the White land, heretofore referred to as mortgaged to Heard, Allen & Floore. It was averred that, at a sale, in October, 1885, under the mortgage to them, Heard, Allen & Floore became the purchasers of the mortgaged cattle for $2,500, and of the real estate mortgaged to them by White for $2,000; and the bill alleged that the firm thereafter realized many thousands of dollars from the sale of said cattle, and received notes and promises to pay for a portion thereof. It was averred that, subsequent to the bidding in of said property by Heard, Allen & Floore, Randolph obtained a judgment in his suit, instituted, as above stated, against Hudson and his bondsmen, and caused the lands formerly owned by White, and then claimed by Heard, Allen & Floore as their property under the said purchase, to be sold upon an order of sale entered in said suit, and became the purchaser at said sale for the sum of $2,250. Complainant further alleged that Heard, Allen & Floore appropriated $10,000 of the $30,000 advance payments upon the contract, by depositing the amount to the credit of Hudson, and then charging the account with a part of the debts due the firm by Hudson, which had arisen prior to the making of the contract with Randolph. It was averred that, when Randolph returned to Texas from Red Fork ranch, 1,959 of the herd of cattle with which Hudson had left Texas were then in the Indian Territory, and were subsequently driven back into Texas by the government authorities; that Randolph caused said cattle to be attached in his then pending action against Hudson and his sureties; that the same were replevied by Hudson, and were subsequently sold by Hudson to the sureties on the replevin bond, he (Hudson) taking the note of said sureties therefor in the sum of $20,660; that Heard, Allen & Floore employed attorneys to procure said attachment to be quashed; that the said 1,959 head of cattle had been bought with plaintiff's money, but that Heard, Allen & Floore constantly sought, and "still seek," to collect their claims against Hudson out of said cattle and the note in question, and had taken the note into their possession, and claimed that a large proportion thereof had been transferred to them. Complainant averred that, in equity, he had the prior right to the said property, or the proceeds thereof. It was also averred that Heard, Allen & Floore claimed to exercise, and did exercise, control over said cattle, and had offered to deliver a portion thereof to complainant in settlement of his claim, and that said firm had delayed and hindered the trial of complainant's suit against Hudson and his bondsmen, and, as a result thereof, by the time the judgment was obtained, it was uncollectible, whereas, if the judgment had been recovered a year earlier, the greater part would have been collected.

The foregoing averments were the basis of the claim, asserted by complainant, that there had been a confederacy and conspiracy between Heard, Allen & Floore and the defendant Hudson to defraud complainant, whereby he had been damaged to the extent of $50,000. In addition, it was alleged that the White land was worth $18,000, the 1,959 head of cattle $20,660, and the 400 head of cattle $11,000; that Heard, Allen & Floore had absorbed other large quantities of land belonging to White, situated in Erath and Palo Pinto counties, Tex., the amount and value of which were to complainant unknown; that Hudson and White voluntarily permitted Heard, Allen & Floore to take large default judgments against them in the district court at Cleburne for $10,979.82 and for $857.13; and that the same were wholly fraudulent and void; but for what reason said judgments were fraudulent and void the bill did not

specifically state. The relief prayed was, in substance, cancellation of the various deeds and mortgages upon the White land, referred to in the bill, and the annulment of the purchase by Heard, Allen & Floore of White's land, as being clouds upon complainant's title to said land; that Heard, Allen & Floore be required to account for the $30,000 advanced by Randolph upon the contract with Hudson, and that judgment be awarded against them for such sum as might be found to have been appropriated for other purposes than that for which the money was furnished; that Heard, Allen & Floore be required to account for and pay over to complainant the proceeds received by them from the sale of the cattle mortgaged by White, as also the proceeds from the sale of the 1,959 head of cattle heretofore referred to.

S. B. Allen and J. W. Floore, for themselves individually, and as surviving members of the late firm of Heard, Allen & Floore, jointly demurred to the bill. S. E. Moss filed a separate demurrer. Both demurrers were overruled. Thereupon, by leave of court, complainant amended his bill by inserting proper allegations of the citizenship of the respective parties, and the insolvency of the defendants in the suit of Randolph v. Hudson et al.

Allen and Floore subsequently filed a joint answer, and specifically denied each allegation of the bill charging Heard, Allen & Floore with fraudulent conduct, and with conspiring to defraud plaintiff, and set forth the state of accounts between the firm and Hudson and White at the time of the execution of the contract. The indebtedness owing from Hudson and White when the contract was entered into was alleged to be bona fide, that the same was not concealed from Randolph, that he made no inquiry upon the subject, and they were under no legal duty to volunteer information regarding the same. They averred that it was not within the scope of the business of the firm for one member to make representations regarding the financial ability of any one, but that no representation was made to complainant by any member of the firm regarding Hudson's integrity or financial ability to carry out the contract with Randolph, and that the only representations made to Randolph were made by Allen, in answer to questions by Randolph, were believed by Allen to be true when made, and were uttered in good faith, and were simply expressions of opinion,—Allen merely stating he thought Hudson could make Randolph secure; that he (Hudson) was a live, energetic person; and that the bond to be given for the fulfilment of the contract was a good bond. Defendants also averred that they had no pecuniary interest in the contract between Randolph and Hudson, and did not try to induce its execution, and that, when the agreement was entered into, they had no reason to question the integrity in business or any other relations of Hudson, did not then know that Hudson had been indicted in the courts of Texas for crimes or felonies, and had not heard of his being convicted of any crime or felony. The answer admitted that Allen solicited Randolph to make the payments through their bank, and averred that the same was done with no intention, on the part of the firm or its members, to appropriate the money to be collected, or any part thereof; but that the request was made in the line of their business, and that the money was collected without any agreement on the part of the firm to see to the appropriation thereof by Hudson, and was deposited to Hudson's credit, and became his property, and subject to his control, and was withdrawn by his checks thereon. Regarding the telegram of May 25th, and his subsequent letter, Allen averred that they were written and sent in good faith, and in reliance upon information believed by him to be true. Floore denied any knowledge at the time of the writing or sending of the dispatch or letter. Defendants averred that the first knowledge on their part of the probable intention of Hudson not to carry out his contract was on August 5, 1885, when one McIntyre presented to them a check, drawn by Hudson, and from him they learned that Hudson was making sales of the cattle. They averred that thereupon they took immediate steps to protect themselves, brought suit, and obtained judgments by default against Hudson, White, et al., and tried to obtain a settlement from Hudson, but failed, and then obtained from White, under threats of attaching his property, the mortgages upon his land and cattle referred to in the bill. They averred that, when their attorney was about to place the first mortgage upon record, he discovered that White had already conveyed his land to his wife and children; that the execution of the second mortgage or deed of trust was then taken, and, in addition, as the land was ascertained not to be as valuable as

at first supposed, a mortgage upon White's cattle was obtained. As a condition of giving said mortgages, White required that they should pay the Blair note, referred to in the bill, and, in order to obtain the security from White, they assumed the payment of said note, and paid the same, and the amount thereof formed a part of the indebtedness for which White executed the mortgage for their benefit. Defendants further averred that the low prices realized upon the sale of the land and cattle were caused by the interference of Randolph, through an attorney, who attended the sale, and warned those present against bidding. They denied any attempt to control the 1,959 head of cattle, but averred that Allen, in the effort to get Hudson to apply the property controlled by Hudson in settlement of the balance still due the bank and his indebtedness to Randolph, was authorized by Hudson to propose to Randolph that he 'and the firm take charge of the cattle, wagons, horses, and all his outfit, and sell them, complainant to receive two-thirds of the proceeds and a note for the balance with security, and Heard, Allen & Floore to receive the remaining one-third, but that the proposition was declined by Randolph. Defendants admitted that they employed attorneys to quash the attachment upon the 1,959 head of cattle, and accepted a transfer of a portion of the note given by the replevin sureties upon their purchase of the cattle from Hudson; but they averred that they did so in an honest endeavor to collect the indebtedness due them, and that they did not authorize a contest of plaintiff's right to recover against Hudson and his sureties, or any attempt to delay the trial of the cause, but employed attorneys to secure for them the benefit of the attempted assignment of a portion of said note, the payment of the note being conditional upon the discharge of the attachment. They further averred that they never realized anything from the note, or from the cattle which formed the consideration thereof. Defendants also alleged that Hudson paid for the cattle collected by him, to be delivered under his contract, upwards of $35,000. It was averred that the White land, after deducting the homestead of White, aggregated 1,935½ acres, and was not worth to exceed $10,000, and that the firm still held the land, except 170 acres, which has been sold for $1,000; that they had sold a lot in Glen Rose, Tex., for $325, and realized from the sale of the 400 head of cattle $4,100, from the sale of a smaller number $75, and had bought, under a sale on a trust deed, a small tract of land worth, probably, $300. The proceeds of the auction sales of White's land and cattle were applied on certain of the notes, and judgments were taken against Hudson and White for the remainder, the judgments embracing interest at the rate of 12 per cent. and 10 per cent. attorney's fee.

S. E. Moss answered the bill, and averred that, at the time of the making of the contract by complainant with W. T. Hudson, defendant was not a resident of Johnson county, Tex., and had no knowledge of the matters stated in complainant's said bill; that, on December 23, 1888, he had purchased Allen's interest in the firm of Heard, Allen & Floore, embracing one-third of the lands in controversy, and paid him, for such interest, in cash, $20,000; and that he made said purchase without knowledge or notice that Randolph laid or would lay any claim thereto, or had any interest therein. Upon information and belief, he adopted the averments of the answer of Heard, Allen & Floore as a part of his answer.

Thereafter evidence was taken, and, upon motion of the complainant, on February 2, 1893, the cause was referred to the standing master in chancery of the court, "to consider and determine upon all matters of law and fact contained therein not heretofore decided by this court, and in connection with such other and further evidence as may be submitted to him by either party"; and said standing master was "required to report his findings and judgment upon the law and facts." There is no recital of any opposition to the motion, and no exception was taken to the order or any part thereof. On May 3, 1893, the master filed his report, and, accompanying the same, referred to in the report, was a copy of the order of introduction of the testimony and the oral evidence introduced at the hearing. The master found as follows:

"(1) There was no conspiracy on the part of Heard, Allen & Floore with Hudson, or any one else, to influence the complainant to make the contract with Hudson in regard to the cattle. (2) That the bond of Hudson, given to Randolph, to secure the money advanced by him to Hudson, was, at the time so given, a good and sufficient bond for the amount of money expressed therein, and that the defendants Heard, Allen & Floore, nor any of them, made any

false or fraudulent statements in regard to same. (3) That the charge, made by complainant, that Allen represented Hudson to be a man of good character, is not proven, under the rules of evidence in such cases, it only being sworn to by complainant, and being denied under oath by the defendants Allen and Floore. (4) That the claim of Heard, Allen & Floore, under which they sold the property of Sam White, was a valid and subsisting claim. (5) That the complainant, L. V. F. Randolph, knew, as soon as Heard, Allen & Floore did, that W. T. Hudson was not going to carry out his contract with him, and that said Hudson was fraudulently disposing of his property to prevent him from enforcing his contract. (6) That Heard, Allen & Floore made no representations to complainant, nor did any act after the cattle bond was signed, that made it not equitable for them to take and enforce their lien on White's land and cattle. (7) That, under the facts in this case, it was not illegal or inequitable for Heard, Allen & Floore to employ lawyers to defeat the attachment proceedings in this court, as alleged by complainant. (8) That complainant was very badly and fraudulently treated by W. T. Hudson, but I can find no facts, under the law, as I construe it, by which the said Heard, Allen & Floore rendered them either legally or equitably liable for the fraudulent acts of said Hudson. (9) I therefore find, and so adjudge, that complainant's bill against the defendants Heard, Allen & Floore be dismissed at his costs. (10) The complainant seeks no relief against the Whites, except to cancel the deeds made to White's wife and children, on which it is unnecessary to make any ruling, because of my former findings in this case, and they seek no relief against W. T. Hudson. I adjudge that the entire bill be dismissed at complainant's costs."

On May 22, 1893, complainant filed exceptions to the findings of the master. On July 8, 1893, the court overruled such exceptions, and approved and confirmed in all things the report of the master, and his findings on the facts, and the law as therein contained, and dismissed the bill of complaint, with costs. The case was then brought to this court by appeal.

Girault Farrar, for appellant.

W. W. Leake, for appellees.

Before WHITE, Circuit Justice, and LOCKE and PARLANGE, District Judges.

WHITE, Circuit Justice, after stating the case, delivered the opinion of the court.

The paper referred to in the report of the master, and filed with his report, styled "copy of the order of introduction of the testimony and the oral evidence introduced at the hearing," was, in effect, a certificate by the master of what was the evidence introduced before him, and was so treated by the trial court. We do not regard the objection of counsel to the right of this court to review the findings, because of the want of a proper certificate, as well taken, and we shall therefore consider the case upon the merits.

While assignments of error are required as well in cases brought into a reviewing court by appeal as in cases brought up by writ of error (rules 11 and 24, subd. 2, par. 2, of this court [11 C. C. A. cii., cx., 47 Fed. vi., xi.]; and see Farrar v. Churchill, 135 U. S. 609, 613, 10 Sup. Ct. 771), such assignments of error clearly must be directed to rulings of the court. This requirement is disregarded in the 34 assignments of error filed in the court below, and contained in the record. They are, in the main, but elaborate arguments in support of the contention that the court erred in sustaining the findings of the master. We shall, however, ignore the unnecessary and superfluous matter contained in the assignments and in the specifications of error stated in the brief of counsel, and treat

plaintiff in error as simply objecting to the rulings of the court upon the findings, and its action in dismissing the bill.

It is difficult to determine, from the bill, precisely upon what theory complainant bases his right to the relief demanded. He avers, for instance, the recovery of a judgment, but nowhere definitely alleges that any sum is owing thereon, although the bill appears to seek an application upon that judgment of the proceeds of the property received by Heard, Allen & Floore from defendant Sam White, as being the property of said White. In some respects the bill is an ordinary creditors' bill, seeking to subject property of a debtor in the hands of a third party. It also seeks to recover alleged trust moneys as the property of complainant. From other allegations, a claim of damages for alleged fraud would seem to be asserted; and relief is also sought to remove a cloud on the title to land of which complainant alleges he is the owner in fee. We may, however, leave out of view, as the basis of any substantive relief, the claim that, by reason of the alleged deceitful and fraudulent practices of Heard, Allen & Floore, complainant was damaged $50,000, not only because no demand for judgment for such damages is asked, but for the reason that a recovery of damages must be in an action at law. Dunphy v. Kleinsmith, 11 Wall. 610; Root v. Railway Co., 105 U. S. 189, 207, 213, 214; Buzard v. Houston, 119 U. S. 347, 7 Sup. Ct. 249. The relief prayed is all sought against Heard, Allen & Floore, and is, in substance, (1) that, as to the lands originally owned by Sam White, and acquired and held by the firm at the time of the filing of the bill, and claimed by complainant to have been purchased by him at the sale under his judgment in his action against Hudson et al., the title of claimant be quieted; (2) that, as to the lands, cattle, and other property acquired by the firm from White, and converted by them into money, and the proceeds of the 1,959 head of cattle attached by complainant in his suit against Hudson et al., and the amount of the note for $20,660, given by the replevin sureties on their purchase of the cattle from Hudson, Heard, Allen & Floore be required to account for and pay the same to complainant, to be applied on the judgment recovered against Hudson and his bondsmen; and (3) that Heard, Allen & Floore be required to account to complainant for the $30,-000 advanced as payments upon the contract with Hudson, and that complainant have judgment for any portion thereof found to have been misapplied.

As to the White land, the record title to which is still in Heard, Allen & Floore, complainant does not appear as a creditor, seeking to set aside fraudulent conveyances, and to subject the land to the payment of his judgment against Hudson et al., after a fruitless attempt to enforce its collection at law, or to set aside such conveyances as being hindrances to the enforcement by sale of a lien acquired in his action at law (Jones v. Green, 1 Wall. 330; Lessee of Sockman v. Sockman, 18 Ohio, 362; Gormley v. Potter, 29 Ohio St. 597); but he sets up an alleged title in himself, which is claimed to have been acquired by purchase at a sale under a judgment in his favor, and asks that his title be quieted. While the bill, in this particular, would seem to be open to the objection that it is a mere ejectment

bill to recover possession of land (Whitehead v. Shattuck, 138 U. S. 146, 11 Sup. Ct. 276; Fussell v. Gregg, 113 U. S. 550, 5 Sup. Ct. 631; Lewis v. Cocks, 23 Wall. 466; Hipp v. Babin, 19 How. 271), yet as a determination of the right to relief sought with reference to the proceeds of the land and cattle formerly belonging to White, received by Heard, Allen & Floore, will be decisive of the right to relief with reference to the land to which the firm now has the legal title, we will consider the issue as to this branch, and dispose of it on the merits.

The averments relating to the second ground of relief set up a right of discovery, and to subject to complainant's judgment the property of his debtor, White, in the hands of Heard, Allen & Floore, and is, in substance and effect, a creditors' bill. The third ground of relief, with reference to the $30,000 advanced payments, does not, however, proceed upon the theory that a portion of that fund, if any, misappropriated, is a debt owing to Hudson, but proceeds upon the assumption that the money was received by the firm with knowledge of the fraudulent intention of Hudson to misappropriate, and under circumstances which made Heard, Allen & Floore trustees ex maleficio of the same.

Before considering the question as to the right of complainant to the relief thus sought, we will notice an application which has been made on his behalf, since the submission of this case, that this court consider, as part of the record herein, an official abstract of the judgment of February 5, 1887, which Randolph obtained in his suit against Hudson et al., certified by the clerk of Somervell county, Tex., to have been filed for record in his county, and duly recorded in the judgment and record book of said county on March 21, 1888. It is stated, in the affidavit of the attorney who represented complainant at the hearing before the master, that this abstract was offered before the master to show notice to the defendant Moss, who claimed to be a bona fide purchaser from Allen, his co-defendant. That affidavit, with others submitted to us in support of the application, in substance set forth that, in the making up of the record before the master, that officer omitted the abstract of judgment therefrom, and all reference thereto, and that the appellant did not discover the omission until after the transcript of appeal had been filed in this court, and after the original had been put into the hands of the printer for printing, in accordance with the rules of this court, and that though repeated inquiries were made of the clerk of the circuit court at Dallas, and of the master, it was not until a short time previous to the application to this court that the abstract was discovered in the hands of the clerk of the circuit court. Counsel for appellees have consented that the abstract in question may be used by us as part of the record here, provided we consider that the record could be amended by certiorari, upon ex parte affidavits, so as to get this judgment into the record, coupling this qualified consent with the statement that he has no personal recollection as to whether the abstract was offered at the hearing before the master, and that the master states that he has no recollection of it. The transcript filed in this court should be a complete transcript of the

record as it exists in the court from whose judgment the appeal was taken. A hearing can be had in an appellate court only upon the record brought from the trial court. Maxwell Land Grant Case, 122 U. S. 365, 375, 7 Sup. Ct. 1271. Presumptively, the transcript of the record before us is complete. In analogy to the order made in U. S. v. Adams, 9 Wall. 661, on an application made in due season, the court below might have directed the master to report as to whether the certified abstract had been introduced in evidence, and, if so, to amend his report to show such fact, but it is clear that we cannot give such a direction. The application is, therefore, overruled.

To determine whether or not the bill and proofs establish a case entitling the complainant to relief necessitates, in the first instance, a consideration of the sufficiency of the exceptions filed to the findings of the master. As all the issues in the case were referred to the master to hear and decide, and this upon the motion of the complainant himself, the case is brought within the rule laid down in Kimberly v. Arms, 129 U. S. 512, 9 Sup. Ct. 355, which requires that we treat the findings of the master as so far correct and binding as not to be disturbed, unless clearly in conflict with the weight of the evidence upon which they were made. Keeping this rule in mind, we take up the first and third findings of the master, which read as follows:

"(1) There was no conspiracy on the part of Heard, Allen & Floore with Hudson, or any one else, to influence the complainant to make the contract with Hudson in regard to the cattle."

"(3) That the charge, made by complainant, that Allen represented Hudson to be a man of good character, is not proven, under the rules of evidence in such cases, it only being sworn to by complainant, and being denied under oath by the defendants Allen and Floore."

The exceptions of complainant, in effect, were that, upon the evidence, the master should have reached directly opposite conclusions. There is an entire absence of proof in the record that any improper motive influenced Heard, Allen & Floore to enter into a conspiracy such as charged in the bill, and there is no proof whatever that they derived any pecuniary benefit from the conduct of Hudson. They did not seek out Randolph, introduce Hudson to his notice, and urge the bestowal of confidence upon him; but Randolph made the acquaintance of Hudson elsewhere, was induced, by the offer of Hudson to supply cattle at a less figure than other parties were willing to furnish them, to negotiate with Hudson, and accompany him to Cleburne to conclude a contract. Allen, who, alone, of the firm of Heard, Allen & Floore, made whatever representations were made by that firm to Randolph, denied that he represented Hudson to be financially able to carry out the terms of such contract, or that he was an honest man, or a man of integrity, but admitted that he did, in reply to inquiries of Randolph, express the opinion that Hudson was able to make plaintiff secure in the performance of such a contract, and that the bond offered by him was a good bond. When Randolph found that Hudson was in truth a customer of the bank, —a fact which, in itself, implied that Hudson was considered honest,—it is altogether unlikely that he would have propounded to the

bankers, and in the presence of Hudson, the broad question whether Hudson was an honest man or a man of integrity. The nature of the business dealings between Hudson and Heard, Allen & Floore also tends to corroborate the testimony of Allen and Floore that they were ignorant, when this contract was made, of the fact that Hudson had been indicted for crimes or felonies, or convicted of crimes or felonies, and that they did not think that Hudson was a dishonest person, or a man with whom it was unsafe to have business dealings. A few witnesses were introduced by complainant who testified that the reputation of Hudson was bad in a section of Bosque county, but it was not shown that such knowledge had extended into Johnson county, where these bankers were engaged in business; and, while two officials of Johnson county testified to the arrest of Hudson on several occasions upon indictments, and the clerk of the court testified to a half dozen indictments of Hudson, running back some 15 years, on charges of theft of cattle and misdemeanors, there was no proof offered to establish the fact that such charges were generally known, or that Hudson was reputed in Johnson county to have been guilty of any serious infraction of law; nor, indeed, was any evidence introduced warranting the inference that any member of the firm knew that Hudson had committed a dishonest act. The defense, however, introduced a number of apparently reputable business men, one (H. S. Wilson) a merchant of Cleburne, who testified that Hudson's reputation, in May, 1885, for honesty, was good, and B. L. Durham, a bank officer at Cleburne, who had never heard, on or before May 8, 1885, that Hudson had ever been indicted for theft or swindling; while the clerk of the district court testified that Hudson never had been convicted of anything except some misdemeanors.

As we have said, Heard, Allen & Floore dealt with Hudson in a manner indicating confidence in his integrity. They had financial dealings with him prior to the 8th of May, 1885, occasionally made loans to him upon the security of his indorsed notes, or upon the hazardous security of live stock, and furnished him money to be used in the purchase of cattle, to be repaid from the proceeds of expected sales. For instance: On the 8th day of May, 1885, when Randolph and Hudson executed their agreement, Heard, Allen & Floore held a 30-day note of Hudson's for $7,400, dated April 21, 1885, secured by a deed of trust on 300 steers. They held a note for $5,000, executed by Hudson as principal, with Sam White, A. J., N. S., and L. B. Hudson as sureties, which note was dated April 31, 1885, and due May 6–9, 1885. The money had been paid to Hudson on this latter note to enable him to purchase cattle with which to carry out a contract he had made to deliver cattle to a purchaser named Baker, who had deposited the price thereof with the banking firm, receiving a certificate of deposit from them, which was to be given to Hudson as payment on the delivery of the cattle; Hudson agreeing that, on receipt of the certificate, he would turn it over to the firm in payment of his notes. Here was an indication that the firm considered Hudson trustworthy, and his personal security of value; else, they would not have relied upon his promise to sur-

render the certificate of deposit in question. A great deal of stress has been laid upon the alleged fact that this $5,000 note was overdue at the time Randolph made his inquiries of Allen concerning Hudson, and that Hudson had negotiated the certificate, instead of surrendering it, as was agreed. But it is consistent with the facts in evidence to assume that the agreed time of payment of the note was when the cattle buyer had received the cattle and delivered the certificate of deposit to Hudson, and that, on the 8th of May, 1885, the certificate of deposit had not been delivered to Hudson, for it was not until the 28th of May that the firm discovered that the certificate had been negotiated, and thereupon debited Hudson's account with an amount equal to the sum to his credit on their books ($4,599.28) in reduction of the amount due on the note. It is not improbable that the explanation offered by Hudson satisfied Heard, Allen & Floore, especially as very nearly the full amount was to his credit, and he was apparently investing largely in cattle to carry out his contract with Randolph. Certainly, the bankers exhibited their continued confidence in Hudson's integrity by loaning him the sum of $5,000, upon the mere security of a new indorsed note, when he protested against this debiting of the balance to his account.

We do not attach weight, as a circumstance tending to show a fraudulent intent on the part of Heard, Allen & Floore, to the fact that the firm did not volunteer information as to the state of Hudson's account with them. They clearly did not, at the time, consider the indebtedness of Hudson a bad debt. The indebtedness originated from ordinary business transactions, and we do not regard the contention well founded that Heard, Allen & Floore owed a duty to Randolph to volunteer information as to the state of their customer's accounts, or the dealings had with them. Nor is the subsequent conduct of Randolph consistent with the claim that, in making the contract with Hudson, he relied upon alleged false representations of the firm as to the integrity, etc., of Hudson. Complainant took a bond to secure himself from the danger of violation by Hudson of his agreement. He telegraphed and wrote, not to the firm, but to Allen, and in a letter to Allen, written late in May, expressing alarm because of the bad reports made to him as to the good faith of Hudson, he made no allusion whatever to the fact that he had made the contract upon the faith of statements of Allen or his firm, and that the reports he was receiving were inconsistent with such statements; nor when, subsequently, he stopped at Cleburne, in June, on his visit to Hudson to personally investigate the progress being made, did he direct Allen's attention to the character of the assurances given on May 8th, or suggest that he had been misinformed, and express a fear that he might sustain loss by reason of having relied thereon.

As before stated, no motive has been proven for fraudulent conduct on the part of Heard, Allen & Floore, or any member thereof, or any reason shown which would have induced them to practice deception towards complainant in order to entice him into making the contract in question. When the drafts for $14,000 and $16,000, respectively, were collected, they were placed to Hudson's credit,

and he was permitted to check the same out at his own pleasure. Had the firm been actuated by improper motives, we would have expected to find them demanding and obtaining from Hudson immediate payments of his then existing indebtedness; but they made no such demand. Hudson checked against his account, as he had been accustomed to do; and when, on August 5, 1885, the discovery of Hudson's bad faith towards complainant was brought to their notice, Hudson's indebtedness to the firm was greater than it was on May 8, 1885. The master drew, from the circumstances surrounding the transaction, so far as they bore upon the conduct of Heard, Allen & Floore, inferences favorable to their good faith. We cannot say that he erred in so doing.

The second finding reads as follows:

"(2) That the bond of Hudson, given to Randolph, to secure the money advanced by him to Hudson was, at the time so given, a good and sufficient bond for the amount of money expressed therein, and that the defendants Heard, Allen & Floore, nor any of them, made any false or fraudulent statements in regard to same."

This finding is fully sustained by the evidence. The allegations of the bill of complaint tend to support it, for it is therein charged that the sureties on the bond, subsequent to the making thereof, and the final consummation by Hudson of the swindle, fraudulently conveyed to B. F. Hudson "about sixty or seventy thousand dollars' worth of property; that W. T. Hudson transferred the larger part of his property to his said brother; and that L. B. Hudson made fraudulent transfers of his property." In the bill, complainant estimates the value of Sam White's property as approximately $50,000. Even though the $60,000 or $70,000 of property transferred to W. T. Hudson embraced cattle bought with Randolph's money, we perceive from the record no good reason to doubt the truth of the testimony of Allen that, when he expressed the opinion that the bond was good security, he honestly believed such to be the fact. This firm, as before stated, dealt with Hudson and his sureties on the basis of their possessing financial responsibility. White was one of the sureties on the $5,000 note of Hudson held by the firm on May 5, 1885, and he was also principal on a note, dated April 22, 1885, and due May 2-5, 1885, for $2,231.55, upon which one of the guarantors on Hudson's contract (Haley) was surety; and White was surety on a 30-day note for $319.46, dated April 7, 1885, being regarded, as to the last-mentioned note, as the only responsible debtor. Disinterested witnesses, one a banker and another a judge, corroborated Allen's opinion, by testimony to the effect that, from the general reputation, on May 8, 1885, of Hudson, White, et al., as to financial responsibility, they would have regarded the bond as perfectly good. We therefore conclude that the second finding was sustained by the evidence.

The fourth finding of the master reads as follows:

"(4) That the claim of Heard, Allen & Floore, under which they sold the property of Sam White, was a valid and subsisting claim."

The exception taken by complainant was that the master should have found the reverse. The consideration expressed in the deed

of trust executed by the White family in favor of Heard, Allen & Floore was the sum of $16,000, and the recited condition of the mortgage was that it was given to secure the payment of $15,633.33, and interest thereon, accrued and to accrue, made up of a note of W. T. Hudson and S. White for $12,833.33, a note of S. White and John R. Haley for $2,500, and a note of S. White and J. S. James for $300. The chattel mortgage recites the consideration as $7,000, and that it was given to secure the same indebtedness as is recited in the real-estate mortgage. The indebtedness of Hudson and White consisted of a 30-day note, executed by W. T. Hudson, with S. White and A. J. Hudson as sureties, dated June 23, 1885, for $4,500 (which was the balance due on the note for $7,400 that the firm held May 8, 1885, and which latter note was secured by a chattel mortgage on 300 steers, but which security the firm released, after payments had been made aggregating about $2,900, in order that Hudson might dispose of the same to complete his contract with Randolph); a note for $5,000, dated June 1, 1885, which represented money loaned on that day, by the firm, practically in renewal of the $5,000 note held by the firm May 8, 1885, and the $3,480.24 note to Mrs. Blair, assumed as a condition of White giving the mortgage.

There was no evidence adduced tending to contradict the statement, under oath, contained in the answer, that this indebtedness was bona fide, and actually due to the firm. While, as to a larger portion of the indebtedness, the money may have been obtained by Hudson for his personal benefit, it is conceded that the notes were overdue, and that the liability of White was fixed if the consideration was valid. White's explanation as to his readiness to secure Heard, Allen & Floore is reasonable. He had had considerable dealings with them. They had often accommodated him in his business transactions. By the deed of trust he was to have 30 days' time to make settlement, and he expected to be able within that time to induce Hudson to save him from loss. Further, Heard, Allen & Floore threatened to attach. They were resident convenient to White's property, and White may well have believed that they were able to protect themselves by hostile measures. That the giving of the security to the bankers was not altogether voluntary is apparent from the circumstance that he concealed from their attorney, when giving the first mortgage, that he had already conveyed the property to his children.

The finding under consideration imports a holding that the allegation of the bill, that the payment of the Blair note for $3,480.24, which formed a part of the consideration of the mortgages given by the Whites to Heard, Allen & Floore, was collusive, and made with the intent to hinder, delay, and defraud complainant, was not supported by the evidence. There is no evidence contradicting the fact that Heard, Allen & Floore, when the mortgage was given, assumed the payment of this note, and within a few days paid it. The surrounding circumstances corroborate their claim that the payment was not voluntary, but was made in order to obtain the desired security from White. The mortgages given by White operated as a double preference by him, in favor of Heard, Allen & Floore,

and also in favor of his creditor, Mrs. Blair. It was not a payment to White of money, whereby White was enabled to divert his property from just claims of others. A preference by a debtor of one or more creditors is not forbidden by the laws of Texas, and is not an unlawful delay or hindrance of other creditors. Sonnentheil v. Trust Co. (Tex. Civ. App.) 30 S. W. 945.

The bill also seeks to annul the sale by Bryan, named as a trustee in White's deeds of trust, on the ground that the consideration in the mortgage by White as to the Blair note was fraudulent, and because the intention of White and the firm was to put and to keep the property out of complainant's reach. These contentions we have just met and disposed of. There is no allegation in the bill that the mortgage was void upon its face. It is not averred that there were irregularities in the sale by Bryan which entitled complainant to any relief, nor was there any attack upon the validity of Bryan's deed for any cause, outside of the alleged fraudulent character of the deed of trust on which the sale was based, which, it was claimed, rendered the deeds of trust void, and the sales thereunder unlawful. Counsel for complainant, however, in their argument, devote much attention to a discussion of alleged irregularities in the manner of sale not specified in the bill; but, as complainant must recover upon the case made in his bill (Foster v. Goddard, 1 Black. 506), proof as to such irregularities cannot afford a basis for substantive relief. The fact, however, that Bryan was an employé of Heard, Allen & Floore, did not tend to show fraud in the transaction. In Texas a mortgagee may also act as trustee to sell, and may sell under a mortgage to himself (Scott v. Mann, 33 Tex. 725; Goodgame v. Rushing, 35 Tex. 722; Marsh v. Hubbard, 50 Tex. 203); and no reason is apparent why a sale made by an employé authorized in the deed of trust to make sale, would not be valid, merely because he acted by the direction of his employer. The deed from Bryan was not introduced in evidence, and is not in the record. We are bound to assume that it was regular and valid upon its face, and passed the legal title. We are, of course, not now concerned with the question as to whether, at another time and in another proceeding, complainant might have been entitled, as a party having an interest in or lien upon the land, to claim that the sale was voidable, because of irregularities in the proceedings, and that he was entitled to redeem or to other relief.

The claim made by the bill is that complainant owns the fee of the White land, the legal record title to which is also apparently in Heard, Allen & Floore, and that the cloud of the trustee's conveyance to them should be removed. The right to such relief, as well as complainant's right to have the proceeds of land and cattle sold applied on his judgment, we think, has not been established.

There was no promise on the part of White to hold the property he then owned or might subsequently acquire as a pledge for the fulfillment of his guaranty. Randolph took no lien upon White's land at that time, and White retained perfect control over it, and could incumber it. Adler v. Fenton, 24 How. 407. Clearly, Heard, Allen & Floore cannot be required to account for the proceeds of

White's property, which they subjected to the satisfaction of valid mortgage liens at a time when that property was not charged with a prior lien in favor of Randolph.

The fifth finding reads as follows:

"(5) That the complainant, L. V. F. Randolph, knew, as soon as Heard, Allen & Floore did, that W. T. Hudson was not going to carry out his contract with him, and that said Hudson was fraudulently disposing of his property to prevent him from enforcing his contract."

The exception alleges that other facts claimed by complainant to have been established by the evidence neutralized this finding. This finding is supported by the evidence and the allegations of the bill to the effect that complainant was informed of the fact that Hudson was cutting out and selling cattle from the herd about August 1, 1885, while the evidence tends to show that the first intimation that Heard, Allen & Floore had that Hudson was not acting in good faith was on August 5, 1885. The finding seems only important as bearing upon the question of good faith of Heard, Allen & Floore.

The sixth finding reads as follows:

"(6) That Heard, Allen & Floore made no representations to complainant, nor do [did] any act after the cattle bond was signed, that made it not equitable for them to take and enforce their lien on White's land and cattle."

In his exception complainant asserted that the finding should have been the reverse of this. From what has been heretofore stated, it is evident that we concur with the master in this finding. Had Heard, Allen & Floore represented they were not creditors of Hudson and his sureties, and had Randolph, to their knowledge, entered into the contract, and executed the bond, upon the faith and assurances of the firm that the parties thereto were not so indebted, it might plausibly be urged that it would be inequitable for the firm to enforce their demands against the property of any of the parties to the bond until Randolph's claim had been satisfied. But, in the case at bar, there was no active concealment by Heard, Allen & Floore of the existing indebtedness, and no duty rested on them to disclose it. The indebtedness was not of such a character as would likely induce the belief on the part of Allen or his firm that its existence would injuriously affect Randolph, or impose on them a moral duty even to volunteer information regarding the same. Advances such as had been made to Hudson were not of an extraordinary character. It appears' to have been the ordinary course of business of bankers in the cattle districts to extend similar accommodations to cattle dealers.

We advert, in passing, to the claim of complainant that fraud is to be inferred from the circumstance that, subsequent to May 8, 1885, Heard, Allen & Floore, at the request of Hudson, and after the payment of $1,987 on the note for $7,400, released their lien on the 300 steers and accepted the personal security of a newly-indorsed note of Hudson. There is no good reason shown for denying to Heard, Allen & Floore the right to do as they did. · The evidence was that it was done at the request of Hudson, in order that he might dispose of his cattle in performance of his contract with

Randolph. There is no proof that the firm designed, by it, to aid Hudson in making a fraudulent disposition of his property. It does not appear that Hudson's financial condition was rendered less favorable. He was, presumably, still possessed of property as large in amount as before the transaction. The conversion of the steers into money or other form of property could not change the value of Hudson's assets. In fact, by reason of the release of the specific lien of Heard, Allen & Floore upon the steers, Hudson's property, to the sum of the value of the cattle, became amenable to the claims of general creditors, who, to that extent, derived a benefit. No good reason exists for the contention that Heard, Allen & Floore, because of Hudson's contract with the complainant, were restricted in their business dealings with Hudson to a mode of dealing which, in the opinion of complainant. might not operate to his detriment, in the event of Hudson not living up to his contract.

We cannot infer fraud from the release of the lien on the steers. It is altogether unlikely that it entered into the minds of Heard, Allen & Floore, or any of the members of that firm, at the time of the execution of the contract, on May 5, 1885, or when they released their lien on the steers, that there would be a deliberate attempt on the part of Hudson to defraud complainant. The utmost that they could reasonably have anticipated as likely to happen was delay or a partial delivery, and the possibility of some loss to Hudson by reason of the forfeiture clause in the contract. Of course, if the deliberate attempt to swindle, subsequently attempted, had been regarded by Heard, Allen & Floore as likely to occur, we should be justified in viewing every act of theirs with much suspicion; but the case established by the evidence does not warrant us in presuming a wrongful intent.

The seventh finding reads as follows:

"(7) That, under the facts in this case, it was not illegal or inequitable for Heard, Allen & Floore 'o employ lawyers to defeat the attachment proceedings in this court, as alleged by complainant."

In his exception complainant states that the master should have reached an opposite conclusion. The interference of Heard, Allen & Floore in the litigation referred to is explained by them as arising from a desire to realize from what they regarded as Hudson's property the balance owing to them. While it is alleged by Randolph that the 1,959 head of cattle which he attached were part of the herd with which Hudson started, ostensibly, for Red Fork ranch, in June, 1885, and were bought with his money, the latter claim is a mere inference, drawn from the circumstance that $30,000 of Randolph's money was paid to Hudson in the expectation that it would be applied in the purchase of cattle. There was no attempt at the hearing to establish that all or any particular portion of this 1,959 head of cattle were bought with the $30,000, though, as a matter of fact, complainant never repudiated the contract with Hudson, or elected to treat the money obtained by Hudson as fraudulently obtained, and the title to it still in complainant. But, even though complainant had done so, and though it be concluded he had a right to follow the proceeds of that money, he could assert no lien against

property where other moneys had also been used in the purchase. Litchfield v. Ballou, 114 U. S. 190, 5 Sup. Ct. 820. The herd originally, when it was started by Hudson from the neighborhood of Kopperl, consisted of more than 3,000 head, and the outfit embraced 50 or 60 head of horses, a number of wagons, and other paraphernalia, which aggregated in value a much larger sum than $30,000, the amount advanced by Randolph. While Hudson was largely indebted to Randolph, he was also largely indebted to Heard, Allen & Floore, and it certainly does not appear improbable that Heard, Allen & Floore entertained the belief that, though Randolph, like themselves, had been the victim of misplaced confidence, they had a legal right to save themselves from loss by realizing whatever balance was still due them from the visible assets of Hudson, however unfortunate the condition in which Randolph had been or might be placed by Hudson's rascality. Heard, Allen & Floore had received mortgages from White to secure an indebtedness aggregating $15,633.33. The purchase price of the sale of the land and cattle under the mortgages by White, to wit, $4,500, was applied in payment of the White and Haley note of $2,500, the White and James note of $319, and a note of White's for $26, and interest on said notes, leaving $1,862.90, which was applied as a credit on the note given by Hudson and White in lieu of the Blair note, which Heard, Allen & Floore had assumed to pay, and had paid, as heretofore stated. The default judgments for $10,979.82 and $857.13, referred to in the bill, represented the balance due upon the Hudson and White notes, less the credit of $1,862.90. The judgments included 10 per cent. attorney's fee, and also interest at the rate of 12 per cent. per annum. Whatever moral obligation might have rested upon Heard, Allen & Floore to make some allowance upon the indebtedness for which these judgments were taken, because of a possible excess of value of the land and cattle, to which they had acquired the legal title by their purchases at the sales under the trust deed, over the amounts bid for the same, they were under no legal obligation to do so. The land, however, appears to have been not readily salable or income-producing; and with the then necessity for the employment of attorneys to protect their interests, and the implied threats of complainant, evidenced by his interference, through an attorney, with the sales under the trust deeds, and the impression which the parties must have derived of future litigation with Randolph, it was not unlawful or fraudulent for Heard, Allen & Floore to stand upon their legal rights, and obtain as great a margin as possible, so that they might recoup themselves, from the increased profits which they might derive, in the future, from the property purchased, for the legal and other expenses and the growing interest account. And it is well to notice the fact that complainant himself is not unwilling to treat the value of the lands to which he claims to have acquired title by purchase at the sale under his judgment as being simply the amount of his bid.

The sweeping allegations, made in the bill, with reference to Heard, Allen & Floore's alleged wrongful interference in Randolph's suit and attachment are not specifically noticed by the master. They

are, however, not only denied in the answer, but find no support in any evidence presented. It does not appear, in the proofs, that they procured the trial of complainant's attachment suit to be delayed, and there is certainly nothing shown to indicate any irregular or improper conduct by them in reference to postponements of the attachment suit, or a wrongful and fraudulent use or abuse of the process or powers of a court of justice, which might be weighed, as was done in Angle v. Railway Co., 151 U. S. 1, 14 Sup. Ct. 240, with other wrongful acts committed by a party, the result of which was the fraudulent acquisition of property to which another had, in equity, a superior claim. The mere causing of delay in a litigation, however, would furnish no ground for an appeal to a court of equity to compel a defendant claiming an interest in property to account in relation to the property, particularly when he had not received the property into his possession or control, or derived any benefit therefrom.

The eighth finding reads as follows:

"(8) That complainant was very badly and fraudulently treated by W. T. Hudson, but I can find no facts, under the law, as I construe it, by which the said Heard, Allen & Floore rendered them either legally or equitably liable for the fraudulent acts of said Hudson."

The converse of this, it is claimed by complainant, in his exception, would have been proper. It follows, from what we have already said, that we are of opinion there was no error committed by the master in reaching the conclusion stated in this finding. The master has made no specific finding concerning the allegations of the bill with reference to the $30,000 collected by Heard, Allen & Floore, and placed by them to the credit of Hudson upon the books of the bank. We find no warrant for the claim that this money was received under circumstances that made the firm chargeable with the duty of seeing to its proper application. Certainly, we would not be justified in holding, from the mere fact that Randolph paid $30,000 as an advance upon the purchase price of the cattle which he had agreed to receive from Hudson, particularly when he had taken security guarantying the payment by Hudson of a heavy penalty in the event of complete or partial failure to perform his agreement, that Heard, Allen & Floore, by the mere receipt, as bankers, of money which they collected for account of a depositor, and which belonged to him, impliedly undertook to see to the proper disposition of the money, and became bound to exercise a supervisory control over the business of Hudson, especially when his course of dealing with the bank embraced various other matters growing out of the general business of cattle buying, and where, from the nature of the account, deposits, simply, of cash or checks, and withdrawals by check, it was practically impossible for Heard, Allen & Floore to accurately inform themselves of the dealings of Hudson. They certainly had no right to question Hudson as to how he conducted his business, or for what reason he checked out his money; and, had they attempted a supervisory control over him, Hudson possessed the right to close his account, and transfer his business elsewhere. Heard, Allen & Floore entered into no agreement

with Randolph to see to the disbursement by Hudson of the moneys advanced by Randolph. They collected it as the agents of Hudson, and were liable to account to him for the money. Whether Hudson disbursed all of Randolph's payments in the purchase of cattle was none of their concern. If, as between Hudson and his bankers, there was no relation of trust created by the credit of the proceeds of the drafts, but merely that of debtor and creditor (Scammon v. Kimball, 92 U. S. 362, 369, 370; Mining Co. v. Brown, 124 U. S. 385, 391, 8 Sup. Ct. 531), it is difficult to see how, in the absence of fraud, a trust relation could arise between Heard, Allen & Floore and Randolph by the mere collection of the drafts. Hudson was not credited with, and did not disburse, the proceeds of the drafts as a mere factor or agent of Randolph, and, therefore, the ruling in Bank v. Gillespie, 137 U. S. 411, 11 Sup. Ct. 118, has no application. If, at the time he entered into his agreement with Randolph, Hudson had formed the intention of defrauding Randolph, and Heard, Allen & Floore had notice of such fraudulent intent when the drafts were deposited with them for collection, it might with some propriety be urged that they became trustees ex maleficio, and liable to account to Randolph therefor; but, while we entertain some doubt whether, upon the evidence in this record, we would be warranted in inferring that Hudson originally intended to defraud Randolph, we are clearly of opinion that the evidence does not justify the inference that any part of the money was appropriated by Heard, Allen & Floore in satisfaction of any indebtedness of Hudson to them. The only ground for the assertion of a claim that there was such an appropriation is the fact, already referred to, that, upon discovering Hudson had negotiated the certificate of deposit, which was to be returned, when received from Baker, and applied in cancellation of his note for $5,000, held by the firm, on May 8, 1885, Heard, Allen & Floore debited his account with a sum equal to the money then to his credit, viz. $4,599.28. But the evidence showed that, of this sum to his credit, thus absorbed by the debit thus made, $1,785.96 was not money which had been advanced from Randolph, but was other money, deposited by Hudson with the bank in the ordinary course of his business, and it was satisfactorily shown that, a few days afterwards, upon Hudson's representation that he needed this money for the purchase of cattle under his contract with Randolph, the firm loaned to Hudson, and placed to his credit, the sum of $5,-000, thus extinguishing the debit made of $4,599.28.

The master also failed to report specifically upon the allegations of the bill with reference to the claim of complainant for an accounting as to the proceeds of a note for $20,660, given by Reed and Odem, on the purchase by them, from Hudson, of the 1,959 head of cattle attached by Randolph. He perhaps regarded the claim as too frivolous to require special notice. Certain it is that there is no proof whatever contradicting the denial of the surviving partners that they collected anything whatever upon the note. Nothing having been received by Heard, Allen & Floore, there is no room for the application of the doctrine that a trust may sometimes arise by reason of an intermeddling with property.

Elsewhere in this opinion we might have appropriately called attention to the fact that Hudson lived at Kopperl, about 30 miles from Cleburne, where Heard, Allen & Floore were located; that his real property was located in the vicinity of Kopperl; and that the cattle for delivery under the Randolph contract were collected at that point, and not at Cleburne. Randolph, therefore, must have contemplated that Allen's knowledge of Hudson's financial ability, and of Hudson's acts in supposed performance of his contract with Randolph, was derived, in all probability, in great part, from mere information from others. We have also failed to notice the claim, made in the argument on behalf of complainant, that the intercourse between Hudson and Heard. Allen & Floore was of an intimate character after August 5, 1885, when the firm first received information that led them to fear that Hudson was not acting honorably towards Randolph. This claim is based upon evidence that Hudson occasionally called at the bank, and that offers regarding the disposition of the cattle, etc., controlled by Hudson, and then in the Indian Territory, were made by the firm. But it is to be borne in mind that the efforts of the bankers were directed to obtaining a settlement from Hudson. They had not antagonized him by hostile measures, and we cannot say, because Heard, Allen & Floore treated Hudson in a manner which induced him to exhibit a willingness to subject the property over which he had control to the payment of his debts, is proof of collusion.

While, also, we are considering the claims of Randolph to a reliance upon representations made by Heard, Allen & Floore, by which he was induced to make the contract with Hudson, it must not be overlooked that he asserts that he endeavored to obtain the signatures of the firm to the bond, and that he claims they declined. In the face of a positive refusal to consent in writing to be bound for the acts of Hudson, it ought not readily to be inferred that representations were made which operated to produce the same liability. The failure, also, of Randolph to bring an action to recover damages for the alleged deceit is in itself a circumstance to be considered in weighing the evidence in the case.

It has become unnecessary, in consequence of the foregoing views, to consider the question whether or not the representations made by Allen were within the legitimate scope of the partnership business, and so binding upon the other members of the firm. It is also unnecessary to consider what bearing the absence from the record of the heirs or representatives of the deceased partner, Heard, would have had in the event we had found that the allegations of the bill had been sustained. Impressed with the zeal and earnestness of counsel for complainant in their efforts to make clear that their client was entitled to relief at our hands, we have carefully examined the voluminous record, and have assumed the presence therein of the documentary evidence certified by the master as produced before him. After such examination, however, and a careful weighing of all the evidence in the case, we have reached the conclusion arrived at by the master and the circuit court, viz. that the complainant has not sustained, by proof, the allegations against the de-

fendants Heard, Allen & Floore. It follows that, as relief cannot be had against them, complainant is not entitled to relief against any of the other defendants, and the judgment of the circuit court is therefore affirmed.