**GRAHAM & LOCKE INVESTMENTS, Inc., et al., Appellants,**

v.

**Thomas Mack MADISON et al., Appellees.**

No. 15042.

Court of Civil Appeals of Texas.

Dallas.

May 25, 1956.

On Motion for Rehearing Oct. 5, 1956.

Further Rehearing Denied Nov. 2, 1956.

**236**

Biggers, Baker, Lloyd & Carver and Joe W. Matthews, Dallas, for appellants.

Austin S. Dodd and Grady Niblo, Dallas, for appellees.

YOUNG, Justice.

Original opinion herein of date March 9, 1956, is set aside and withdrawn; and the following substituted in its stead:

The suit was initially in trespass to try title by T. B. Madison against Graham & Locke Investments, Inc., B. A. Graham, and J. O. Talley, for recovery of two tracts of land and improvements in vicinity of Central Expressway, Routh and Bryan Streets, Dallas; by amendment becoming an action by T. B. Madison, individually and as trustee, and nephew Thomas Mack Madison, to set aside a deed of B. A. Graham, substitute trustee, dated March 3, 1954; in other words, to vacate and hold for naught a March 2, 1954 proceeding of foreclosure; alleging usury in the $3,000 second lien note declared in default and basis of the public sale, gross inadequacy of sales price, irregularities incident to foreclosure, disqualification of substitute trustee by way of relationship to purchaser, etc. The only answer to plaintiffs' trial pleading was a plea of not guilty.

On trial to the court, said trustee's deed was voided and title to the property reinvested in Thomas Mack Madison as bene-

ficial owner of said land, conditioned on adjustment of equities, i. e., cash deposit into court by Madison along with other decretals, from which judgment adverse to Graham & Locke this appeal is taken. The Madisons also excepted to certain rulings against them. Background of suit and sequence of events leading up to said District Court judgment must first be set forth in greater detail.

Prior to July 29, 1952, title to the property in controversy was in T. B. Madison, he conveying same on that date to his nephew and partner in the real estate business, Thomas Mack Madison; the latter on July 31, 1952 executing a promissory note in principal sum of $20,000 to The Praetorians at 6% interest per annum, payable in monthly installments of $255.20 and secured by first lien deed of trust. On August 29, 1952 Thomas Mack Madison reconveyed the property to his uncle, T. B. Madison, trustee, with deed not recorded until May 7, 1954. In June 1953, the Madisons, needing additional funds, consulted with J. O. Talley, a broker in real estate loans. A $3,000 second lien note against the property of date June 19, 1953 was then executed by Thos. Mack Madison, and T. B. Madison "Co-Signor"; with J. O. Talley, payee, interest at 5% per annum, payable in eleven monthly installments of $75 each, balance due in twelve months, the note being held by payors until negotiated by Talley. This broker at once interested one O. L. Nelms in the transaction, who agreed to pay $2,500 for the note, conditioned on furnishing of mortgage policy. The services of Texas Title & Abstract Company, whose attorney was Edgar W. Layton, were engaged for that purpose. The deal was closed by the Title Company on June 22, 1953, Nelms having delivered to it the sum of $2,500; disbursed on letter of Thomas Mack Madison to various parties; inclusive, according to Layton, of a $200 brokerage fee to J. O. Talley on oral instruction of said Madison. Assignment of lien to Nelms from Talley and the Thomas Mack Madison deed of trust se-

curing the note to Edgar W. Layton, Trustee, were dated June 19, 1953 (date of note).

On January 26, 1954 appellant Company purchased this note, paying full value ($2,851.52), with assignment of lien from Nelms, at which time the November, December, and January installments of $75 each were past due. B. A. Graham then visited T. B. Madison and requested him to catch up on these payments which the latter promised to do. About the same time appellant discovered that the Madisons were considerably in arrears on The Praetorian first lien note payments; Graham again going to Madison's office on the premises (1014 Routh Street) and inquiring for Mack Madison to no avail; asking for payments past due of T. B. Madison without success; then electing, as he testified, to declare the $3,000 note wholly due after notice to the elder Madison. Appellant Company immediately paid The Praetorians the sum of $1,176 past due on that note; then secured the resignation of Layton as trustee in second deed of trust and appointed B. A. Graham substitute trustee, who posted notices on January 30, 1954 for trustee's sale on March 2. At the public sale conducted by the substitute trustee on said date, the property was knocked off to Graham & Locke Investments, Inc., on its bid of $1,000, with trustee's deed of March 3, in accordance. By later proceedings in forcible entry and detainer, T. B. Madison was evicted from the property, appellant thereby gaining possession; on the trial duly accounting for rentals received therefrom by the Corporation. Beginning in 1952, Thomas Mack Madison was engaged as a student at Tuskegee Institute in Alabama; then in U. S. Air Force as a pilot; at time of trial, on assignment in Japan, his testimony being in form of deposition taken prior to departure.

In first amended petition plaintiffs had prayed for relief, viz.: Removal of cloud from title to the property by reason of said

trustee's deed and for cancellation thereof; upon determination of true amount due on the $3,000 note, that plaintiffs be permitted to pay such sum into registry of court; for judgment against J. O. Talley of $400 as double the amount of $200, a usurious charge exacted by him; that $700 of the second lien note be declared a usurious interest charge; and said sum not having been received by Thomas Mack Madison, that it be applied as a credit on the $3,000 note; that defendant render an accounting of all rents received while in possession and applied toward payment of the note; for reasonable rental value of the premises from and after March 3, 1954 and for $5,000 damages to personal property removed from 1014 Routh Street, consequent upon the alleged unlawful eviction.

The record includes a statement of facts. In addition, the court made lengthy findings of fact and conclusions of law in support of plaintiffs' judgment, fixing $6,781.06 as the amount they should tender into court for benefit of defendant in adjustment of equities, which deposit was made April 20, 1955; finding the $3,000 note not to be tainted with usury at its inception; dismissing J. O. Talley as defendant and fixing $40,000 as reasonable market value of the property at time of foreclosure. Further conclusions were to effect that the bid of $1,000 for the property at public sale was grossly inadequate, considering its cash market value of $40,000, subject to encumbrances of about $21,000; also concluding "that said inadequate sale price, standing alone, might not be sufficient alone to vacate and set aside said substitute trustee's deed and sale; but when coupled with other equitable considerations in the light of all facts and circumstances in evidence in this cause, the same should be set aside and vacated."

Points of appeal may be summarized, viz.: The trial court's error in finding that sales price of the property at the March 1954 foreclosure was grossly inadequate; that competent evidence was lacking or at least insufficient for the court's finding of $40,000 as reasonable market value of the property on date of the trustee's sale; that the sales price to appellant was not $1,000, but in fact some $21,000 (balance due on first lien plus moneys advanced thereon by defendant Company and in purchase of the $3,000 note). Further points will be numbered as in appellants' brief: (5) No irregularity was involved as regards art. 5937, Vernon's Ann.Civ.St., §§ 70 to 86 inclusive (presentment and exhibition of note to maker prior to declaring same wholly in default), because (a) of no evidence or insufficient evidence that the note was not in fact exhibited; (b) that above statute does not require an exhibition of note unless demanded by the maker; (c) waiver of the requirement (if there was such), the alleged defect not having been raised prior to the time of trustee's sale; (d) the technicality was likewise waived, appellees not having pled that appellants failed to exhibit the note at time payment in full was demanded; and (e) that the law does not require the holder's exhibition of note to a maker who is not in the county where note is payable. (6) Similarly, our laws do not "prohibit an officer and principal stockholder of the beneficiary corporation from being a trustee under the deed of trust and selling to the beneficiary corporation at the trustee's sale." (7) Appellees are not entitled to equitable relief "as they did not come into court with clean hands."

The settled rule is stated in Sparkman v. McWhirter, Tex.Civ.App., 263 S.W.2d 832, 837, (writ ref.), that a "trustee's sale will not be avoided merely because of inadequacy of price. Thornton v. Goodman, Tex.Com.App., 216 S.W. 147; for avoidance and in conjunction, there must be evidence of irregularity, though slight; which irregularity must have caused or contributed to cause the property to be sold for a grossly inadequate price. (Citing authorities.)" In consequence of above quoted principle it is manifest that

appellants' points 5 and 6 are controlling of all others advanced for reversal; and in interest of brevity we will pass over points 1 through 4 with the following general statement: (1) That the court's finding of $40,000 as the reasonable market value of the property in question on date of trustee's sale had support in competent testimony; but that (2) under Texas Court holdings involving comparable situations, the instant trustee's sale price of $1,000 was not grossly inadequate. See Richardson v. Kent, Tex.Civ.App., 47 S.W.2d 420; Miller v. Gibraltar Sav. & Bldg. Ass'n, Tex.Civ.App., 132 S.W.2d 606; Thornton v. Goodman, Tex.Com.App., 216 S.W. 147 (adopted by Supreme Court); Sparkman v. McWhirter, supra. (3) That, rather than the amount recited in the trustee's deed, the actual consideration involved in the public sale to appellant was the moneys advanced on the two notes plus a virtual assumption of the balance due on the $20,000 note in self-protection.

We now reach appellants' fifth point challenging the trial court's conclusion of law that the March 1954 foreclosure of property was illegal and void because of the holder's failure to exhibit such installment note to the maker before declaring it wholly due. Such conclusion (3–b) recited in part: "The defendant, Graham & Locke Investments, Inc., holder of said note, had no right to declare due the whole sum of said note before starting the said deed of trust foreclosure sale or concluding such sale, having failed to exhibit said note to the person from whom payment was demanded, the evidence being insufficient to show any waiver of right to demand presentment or lack of necessity for exhibiting same. See Article 5937, sec. 74, Texas Revised Civil Statutes; and portion of opinion in Faulk v. Futch, 214 S.W.2d 614, at page 616, citing Griffin v. Reilly [Tex.Civ.App., 275 S.W. 242] and other authorities." Said $3,000 note provided in such respect: "It is understood and agreed that failure to pay this Note or any installment either of principal or interest hereon when due, or the failure to perform any of the agreements contained in said Deed of Trust, shall, at the election of the holder of said Note, mature the said Note, and same shall become at once due and payable and subject to foreclosure proceedings under said Deed of Trust." Notice of trustee's sale recited that "Default has occurred in the payment of said indebtedness and the same is now wholly due, and the owner and holder of said indebtedness has requested the undersigned to sell said property to satisfy said indebtedness." On the note in question was written "1014 Routh Street, Dallas, Texas," at which location was a brick building where the Madisons had maintained a real estate business.

T. B. Madison did not testify at the trial; testimony relevant to the foregoing point being from substitute trustee Graham, called to the stand as an adverse witness by counsel for appellees. Excerpts from the testimony of this witness are quoted:

"Q. Now, following the acquisition from O. L. Nelms of the note and deed of trust securing it, what was the next step that was taken? A. The next thing was that I talked to Madison to get him to make the payments, pay the thing up, delinquent payments.

"Q. Well, was that before, was that the next step you took? A. Yes, the next thing I done.

"Q. When did you do that? A. A few days after I discovered he was in arrears with his payments.

"Q. * * * you discovered that at the time you acquired the note, didn't you? A. I don't believe so. * * *

"Q. * * * Mr. Graham, I believe I have asked you if you ever talked with Thomas Mack Madison and you said, 'No.' Did you ever present this note to Thomas Mack Madison for payment? A. No.

"Q. Did you ever exhibit it to the maker, Thomas Mack Madison, before you posted it for sale? A. I talked to this Madison here (indicating) several times before I posted it.

"Q. But you never talked to Thomas Mack Madison, the maker of the note? A. No. * * *

"Q. (By Mr. Dodd) Now, did you have the note with you when you were talking to Thomas B. Madison? A. *I wouldn't say that I did,* because when you go out—(Emphasis ours.) * * *

"Q. Now when you talked with Thomas B. Madison what did you tell him as to who the owner of this note was? A. I told him Graham & Locke Investment.

"Q. How much money were you asking at that time? A. I would have to refer to the record; I don't recall just how much money I was asking him for. * * *

"Q. Well, can you give me any idea? What is your record? * * * A. He was delinquent on the payments, so I asked him about paying up his payments.

"Q. Is that the only thing you asked about, as to payments, just the delinquent payments? A. That is the only thing I was interested in, was the back payments on the property, yes, sir.

"Q. You didn't make any demand on him for the payment of the—for the whole note at that time? A. No.

"Q. You never made any demand on Thomas Mack Madison for the whole note? A. I never seen Thomas Mack Madison * * *

"Q. Mr. Graham, when you conducted this foreclosure you elected to declare the whole second lien note due, didn't you? A. Yes.

"Q. You elected to exercise that election beforehand, before you con-

ducted the sale? A. I don't understand your question.

"Q. When did you first elect to declare the whole thing due? A. I declared the whole thing due immediately after I discovered that the first lien note was so far behind there that the first lien holder was going to foreclose on it if I didn't, and I had to do something to protect myself.

"Q. You elected, then, to declare the whole $3,000 note due? A. Yes. * * * A. I had to do that to defend myself, and if the first lien holder had foreclosed I would have lost my money.

"Q. Did you give Thomas Mack Madison notification you elected to declare that $3,000 wholly due? A. I certainly did.

"Q. Now, how did you do that? A. By going to his office, telling him that it was due and—

"Q. I asked you if you notified Thomas Mack Madison? A. Oh, no, Thomas B. Madison, I did.

"Q. But Thomas Mack Madison, who signed the note, you never saw? A. No.

"Q. Never had any communication with him? A. No.

"Q. Never sent him any notice of any kind that you elected to declare that whole note due? A. I went by the address he gave me on the note to see Thomas Mack Madison and Thomas B. Madison, I told him my mission.

"Q. I didn't ask you that. You made no inquiry about where Thomas Mack Madison was? A. I certainly did, yes.

"Q. What inquiry? A. I asked Thomas B. Madison where— I told him I wanted to see Thomas Mack Madison. He said, 'he is not here.'

I said, 'I am out here about this note. It is way past due.' He says, 'Well, I will get you the money shortly. I will take care of that,' and I went by twice, two or three times.

"Q. You haven't answered the question. Did you learn where he was? A. No. Thomas B. Madison told me, he said, 'I will take care of that.' I didn't talk to him about his being in the service. I didn't know he was in the service until his deposition was taken and I learned through my attorney he was in the service. Nobody told me differently. I don't know he was in the service."

It is not disputed that Thomas Mack Madison was out of Dallas County at time of above occurrences, he having authorized T. B. Madison to act for him on all business matters during the interim and that such was the purpose of his 1952 conveyance of the property to his uncle as trustee. Further, that the second lien deed of trust did not authorize the trustee named therein or his substitute to accelerate payment of said $3,000 note for any default in first lien installment payments, but that the following proviso constituted a part of such second lien deed of trust: "It is specially agreed that in case of any sale hereunder, all prerequisites to said sale shall be presumed to have been performed, and that in any conveyance given hereunder all statement of facts, or other recitals herein made, as to the non-payment of money secured, or as to the breach or non-performance of any of the covenants herein set forth, or as to the request of the trustee to enforce this trust, or as to the proper and due appointment of any substitute trustee, or as to the advertisement of sale, or time or place or manner of sale, or as to any other preliminary act or thing, shall be taken in all courts of law or equity as prima facie evidence that the facts so stated or recited are true."

Recurring again to the trial court's conclusion of law (3-b), same obviously has its basis in the established rule restated in Faulk v. Futch, Tex.Civ.App., 209 S.W.2d 1008, 1010, affirmed 147 Tex. 253, 214 S.W. 2d 614, 5 A.L.R.2d 963, that "Where the acceleration clause in a promissory note leaves it optional with the holder whether he shall declare the whole amount due upon failure to pay any installment of principal or interest, such holder cannot without presentment for payment, exercise his option to declare the whole amount due, if no specific place of payment is expressed in the note, until it has been presented to the payer at the latter's known place of business"; and art. 5937, § 74, providing that: "The instrument must be exhibited to the person from whom payment is demanded, and when it is paid must be delivered up to the party paying it."

■ No failure of presentment or exhibition of note as a prerequisite of the holder's right to mature an installment note was affirmatively pled by appellees. This issue would therefore appear as having been waived unless preserved, in view of Rule 67, Texas Rules of Civil Procedure; and certainly, the point was insufficiently developed at the trial, Madison, the co-maker and representative of Thomas Mack Madison, not even testifying. A presumption consistent with presentment of note may be inferred from his silence, together with above quoted recitals of appellees' second deed of trust that all prerequisites necessary to trustee's sale shall be presumed to have been performed. See Faine v. Wilson, Tex.Civ.App., 192 S.W.2d 456; Cunningham v. Paschall, Tex.Civ. App., 135 S.W.2d 293; Slaughter v. Qualls, 139 Tex. 340, 162 S.W.2d 671, affirming Tex.Civ.App., 149 S.W.2d 651.

■ Be this as it may, the repeated demands of Graham upon Madison for payment of delinquent installments were fruitless, presenting a situation identical with that dealt with in Faulk v. Futch, supra, where the San Antonio Court, construing

**242**

secs. 70[1] and 74, art. 5937, in such connection, held: "Appellee does not say that he presented the note, as is required by the Negotiable Instruments Act, art. 5937, § 74, Vernon's Ann.Civ.Stats. However, if appellant told him that he did not have the money and could not make payment and did not demand that the note be presented, Futch was not required to present the note." And in its opinion of affirmance the Supreme Court had this to say [147 Tex. 253, 214 S.W.2d 616]: "Respondents owned the note at the time demand was made of the petitioners for payment thereof, but petitioners had the right for their protection to demand the presentment of the note before the installments were paid. The testimony does not show that petitioners failed to pay the installments due on the note on the ground that respondents did not present the note at that time, but Faulk made the statement, according to the testimony of Futch, that they were unable to pay the installments due. The petitioners had the right to demand the presentment of the note when payment of same was demanded by respondents, as provided for under Article 5937, Section 74, supra, and they could also waive their right to have the note actually exhibited." See also Carroll v. Sartain, Tex.Civ.App., 164 S.W.2d 52.

■ Likewise the trial court erred in its conclusion that B. A. Graham, officer and principal stockholder in the corporation beneficiary under the deed of trust, was thereby disqualified from acting as substitute trustee with the beneficiary corporation as the successful bidder. "A deed in trust to secure a debt is in legal effect a mere mortgage with power of sale. McLane v. Paschal, 47 Tex. 365. Interest in the debt secured does not disqualify one from acting as trustee. The mortgagee may himself act as trustee, and become

the purchaser under such sale. (Citing authorities.) In view of this holding by our Supreme Court, the Circuit Court of Appeals of the Fifth Circuit, in Randolph v. Allen, 73 F. 23, 37, 19 C.C.A. 353, 367, held a sale by a trustee, an employe of the beneficiary, and at his direction, valid." Thornton v. Goodman, supra [216 S.W. 148]. See also Heiner v. Homeland Realty Co., Tex.Civ.App., 100 S.W.2d 793; Dall v. Lindsey, Tex.Civ.App., 237 S.W.2d 1006; Southern Trust & Mortgage Co. v. Daniel, 143 Tex. 321, 184 S.W.2d 465.

■ We reach appellees' cross-assignments complaining of certain adverse court rulings; first, by exception thereto in the judgment and now presented in appropriate points; in which connection appellants' motion to dismiss the cross-appeal is overruled. Graham & Locke, Inc., has brought up the entire judgment for review, to which the adversaries' right to file cross-assignments at once attached. 3–B Tex. Jur., Appeal and Error, p. 156; Ward v. Scarborough, Tex.Com.App., 236 S.W. 441; Bowman v. Puckett, 144 Tex. 125, 188 S.W.2d 571; Rule 420, T.R.C.P.

■ Appellees' first and second cross-assignments are to effect that the mentioned second lien note was usurious in its inception, they receiving only $2,300 as result of the transaction; the note thereby not being in default at time of foreclosure if credited with the $700 alleged unlawful charge. The trial court found to the contrary, dismissing J. O. Talley, original payee. The latter defendant was not made party to this appeal, with resulting finality of judgment as to him. Also the record undisputedly reveals that the $200 payment to Talley was by way of brokerage, paid by the borrower negotiating the note. "A commission paid to the agent or broker of a borrower, for services rendered in re-

1. Section 70 provides: "Presentment for payment is not necessary in order to charge the person primarily liable on the instrument; but if the instrument is, by its terms, payable at a special place, and he is able and willing to pay it there at maturity, such ability and willingness are equivalent to a tender of payment upon his part. * * *"

spect of the transaction, will not render a loan usurious if the lender has no interest therein." 42 Tex.Jur., sec. 41, p. 933.

Appellees' third cross-point asserts usury in inception of the note as regards the Nelms part of the transaction; in effect, that same evidenced a $3,000 obligation of the Madisons, and negotiated by their broker Talley to Nelms for $2,500; constituting usury; in consequence, that no part of the principal debt was due at time of the foreclosure sale, thereby rendering premature and void the entire proceedings. In this connection we must further examine the note, the circumstances of its execution, and brief history. It was dated June 19, 1953, contemporaneously with the Mack Madison deed of trust and assignment by Talley to Nelms. Although Talley was the payee, the proceeds ($2,500) were disbursed to the Madisons or on their order; said "payee" never having had possession of the note, with the deal completed upon processing by the Abstract Company, inclusive of the mortgage policy required by Nelms. The latter then assigned the paper to Republic National Bank of Dallas as collateral; on January 26, 1954 transferred back to him and over to Graham & Locke Investments, Inc. Nelms, testifying, stated that he was in the business of finance and real estate; recalling no more than that he had acquired the $3,000 note from Talley for $2,500, not remembering to whom his check was made payable. Talley further stated that he was acting as broker for the Madisons throughout the deal; i. e., to find a purchaser for the note on terms satisfactory to them; and for which service he was to receive a commission; also that Madison furnished the mortgage policy. The second lien deed of trust securing the $3,000 note was filed for record on June 24, 1953.

 Article 16, sec. 11, Vernon's Ann. State Constitution, provides that "All contracts for a greater rate of interest than ten per centum per annum, shall be deemed usurious * * *." And art. 5071

says, in part, that "all written contracts whatsoever, which may in any way, directly or indirectly, provide for a greater rate of interest shall be void and of no effect for the amount or value of the interest only; but the principal sum of money or value of the contract may be received and recovered." Also, it is familiar law that "If there be an intention to charge usury, no matter how the transaction may be veiled or disguised, the courts will look through the form to the substance of the transaction and condemn the contract as usurious." Wellfare v. Realty Trust Co., Tex.Civ.App., 85 S.W.2d 1067, 1069. But where the facts and circumstances plainly demonstrate the existence of a usurious contract, an intent to exact usury may be conclusively presumed. In determining the question of usury, all devices are disregarded and whenever the courts are satisfied that there is a charge contracted for, merely for the use of money, in excess of that allowed by law for interest, they will treat it as usurious, in whatever guise it may be shown to exist. 42 Tex.Jur., pp. 885-6. Separate instruments, contemporaneously executed, as a part of the same transaction and relating to the same subject matter, are to be construed together as a single instrument. Rudes v. Field, 146 Tex. 133, 204 S.W.2d 5; 42 Tex.Jur., (Usury), p. 891.

Turning to the case at bar, the trial court correctly held that a commission paid to the broker or agent of the borrower for services rendered in respect to the transaction will not render the loan usurious, if the lender is not interested. 42 Tex.Jur., supra. But in our opinion, the $500 differential between face of the note and money advanced by Nelms for its purchase, presents quite another situation. Cross-appellee argues the nonexistence of usury; that the case is one of simply a bona fide purchase at a discount. Otherwise stated, that this Honorable Court has before it a situation "where the makers of a negotiable promissory note executed it without consideration naming as payee

their agent and broker and directing and aiding said agent and broker to sell it at a discount to a third person who purchased it in good faith and without knowledge of the relationship between the makers and payee."

The contention must be overruled. Under undisputed facts the role of Talley as mortgagee in the transaction is conclusively shown to be a simulated one; and as cross-appellee tacitly admits, sale of the note to Nelms was by the Madisons through their agent Talley. The conclusion is inescapable that Nelms was chargeable with notice that his advancement of money was going to the Madisons and that Talley was but an intermediary whose only interest was to obtain a commission for negotiating the loan.

As a result, Nelms was actually the purchaser of a note from, or the lender of the money to, the Madisons, exacting an obligation of a larger amount; in either event, a manifestly usurious transaction. 42 Tex.Jur. 906. "When the chose discounted is obtained directly from the maker or before it has acquired validity by a transfer for value, it can be nothing more than the maker's promise to pay, and the purchase of such a promise at a discount exceeding the lawful rate of interest is merely making a loan at a usurious rate." 91 C.J.S., Usury, § 19, p. 595. 55 Am.Jur., p. 345; Annotations, 165 A.L.R., p. 642; Morris v. First State Bank of Dallas, Tex.Civ.App., 192 S.W. 1074. "If the transaction was in substance and fact a loan of money by appellees to Crozier, the mere fact that the note was made payable to Gribble, and by him indorsed to them, will not alter its legal features nor serve to avoid the consequences of usury. If a note is offered for discount by the maker, it is plainly usurious as between him and the party to whom it is delivered, if the discount from its face value were greater than that allowed upon a loan." Wilson, Texas Civil Cases, sec. 802, p. 706.

Under art. 5071, V.A.C.S., the recovery by Nelms would be limited to the $2,500 actually advanced in acquisition of the note, less statutory credits; and the equities of cross-appellee can rise no higher than its assignor, having purchased the note after maturity; at least with respect to three installments of principal. Art. 5935, § 58, V.A.C.S., provides, in effect, that the party taking a note after maturity is not a holder in due course, but takes it with notice of and subject to all the defenses which might have been asserted against his assignor; Reconstruction Finance Corp. v. Smith, Tex.Civ.App., 96 S.W.2d 824 (writ ref.). And application of the usurious exaction hereinabove discussed ($500) to the installments first maturing left none past due on date of foreclosure; such action by the trustee therefore being premature and void.

If we be correct in the foregoing conclusions, it is evident, as cross-appellants point out, that the trial court has required an excessive cash deposit in its judgment; itemized as follows: $346.24 as 10% interest charged on the unpaid principal of $2,813.33 (Original $3,000 note), and $41.33 credited to interest on back of said note. Complaint is made of further items making up the deposit of $6,781.06 as of April 18, 1955, as follows: $451.25, being 25% of $1,805 of rents collected from the property, as a reasonable service charge due Graham & Locke Investments; also failure to charge said defendant with legal interest on rents collected. Concerning these items, there is no pleading or proof in support of the trial court's credit to defendant corporation of a 25% charge for rent collections and same should be disallowed. In the adjustment of equities said rental item of $1,805 should be deducted from credits due the corporation for payments on first lien, with interest allowed only on the difference or balance of payments. The judgment requiring cross-appellants to deposit $6,781.06 is accordingly reformed and corrected by reduction of the deposit to

the extent of these mentioned items, with reimbursement to Thomas Mack Madison in the amount of such excess by the District Clerk.

Otherwise, we hold that the trial court properly ruled in favor of Thomas Mack Madison herein, although on grounds other than stated in its findings and conclusions; and as modified and reformed in the particulars just mentioned (reduction of deposit), the said judgment must be affirmed.

Affirmed.

## On Motion for Rehearing.

■ Article 5071, V.A.C.S., declares in part that written contracts providing for usurious interest "shall be void and of no effect for the amount or value of the interest only; but the principal sum of money or value of the contract may be received and recovered." The meaning and effect of this proviso of the statute is stated in 42 Tex.Jur., Usury, sec. 45, p. 939: "In other words, in respect of written contracts there is now a forfeiture of both the legal and illegal interest. The contract is thus left as though it did not provide for interest, but it is not vitiated beyond that. Recovery of the principal sum of money or the value of the contract is expressly authorized * * *." Annotations to Article 5071, Vol. 15, Vernon's Civil Statutes, carry numerous holdings to like effect: That (1) charging of usurious interest does not render unenforceable the agreement to pay the principal. Clayton v. Ingram, Tex.Civ.App., 107 S.W. 880, 881; Watson v. Evans, Tex.Civ.App., 195 S.W. 1170. (2) The right to demand interest on the balance due on the principal is denied by statute because of usury and the creditor's claim is limited to collection only of such principal. Dallas Trust & Savings Bank v. Brashear, Tex.Com.App., 65 S.W.2d 288. (3) Deduction of interest in advance from face of note, even though consisting of contract for usurious interest, does not alter obligation for money actually loaned or paid on note, and all signers are bound by terms of note except as to usurious interest contracted for, which may be deducted from principal as represented by face of note. Schmidt v. Citizens Industrial Bank of Austin, Tex.Civ.App., 89 S.W.2d 847. (4) And if usurious interest be merely contracted for, only that amount may be deducted from the principal debt. Yonack v. Emery, Tex.Com.App., 13 S.W. 2d 667, 70 A.L.R. 684. (5) It is settled law in this State that a sale of land by a trustee under deed of trust for the payment of a debt, of which part is void and part valid, is not a nullity. Hemphill v. Watson, 60 Tex. 679; State Mortgage Corp. v. Ludwig, 121 Tex. 268, 48 S.W.2d 950.

■ Under the foregoing construction of art. 5071, cross-appellees contend that, even assuming usury in the original $3,000 note as negotiated to Nelms, still the foreclosure sale was validly held. They say that where a contract is partially usurious and partially valid, the usurious part is void, but such valid part of the contract is enforceable according to its terms; that the $500 bonus, so-called, having never been actually paid by the borrower, appellants are without authority to credit such excess amount to the installments first maturing. In other words, that at most the written contract should be treated as one for $2,500 payable in eleven monthly installments of $75 each beginning August 1, 1952, balance due at twelve months; and that at time of foreclosure the Madisons were delinquent in payment of at least three monthly installments on the valid debt; the trustee being well within his rights in foreclosing the deed of trust lien as he did. Consistent with above cited cases we must sustain points 10 and 11 of cross-appellees; having mistakenly held in original opinion, (1) that the $500 discount in question should have been credited on the note installments first maturing, as such amount was never paid by cross-appellants; and (2) that the foreclosure in question was premature and void. For manifestly after application of all installment payments by the Madisons

to reduction of the valid principal ($2,500), the same remained delinquent at inception of foreclosure proceedings; rendering applicable the settled principal, first announced in Hemphill v. Watson, 60 Tex. 679; and followed in Texas Co. v. Tucker, Tex.Civ.App., 129 S.W.2d 762 (Writ ref.) "that after a sale of real estate has been made, under the terms of a deed of trust, and the debt is thereby paid, it is too late to thereafter attempt to set the sale aside for vice or frailties in the obligation for which the security was given, and the sale made to satisfy. This is especially true where, as in this case, a part of the debt for which the security was given was unquestionably valid, even if another portion consisted of void usurious interest. A sale under the provisions of a deed of trust, under such conditions, is not void." See also Volunteer State Life Ins. Co. v. Sumner, Tex.Civ.App., 74 S.W.2d 319.

Above conclusions would render unnecessary any discussion of points 1 to 9 as presented by cross-appellees; but relative thereto the following may be stated briefly: (1) It is still our view that Nelms was chargeable with notice of the Title Company transactions concerning manner in which his check for $2,500 was disbursed. According to Mr. Layton, on its books the entire deal was "charged to T. B. Madison" with disbursements by checks as follows: Mortgage policy premium $42; $5 escrow fee; County Clerk $3.25 recording and transfer fee; attorney's fee $5; to Collector of Internal Revenue $500; Merchants State Bank $531.33; J. O. Talley $200; City Tax Collector $225.76; Thos. B. Madison, three items totaling $987.66. A trial court finding that Nelms was not the lender, but a purchaser of the original note in good faith, would be to "ignore the realities"; as was observed in Elliott v. Schlein, D.C.Mun.App., 104 A.2d 418, 420, under almost identical facts. So, also, in Schanz v. Sotscheck, 86 Misc. 121, 149 N.Y.S. 145, Id., 167 App.Div. 202, 152 N.Y.S. 851. (2) In point 9 cross-appellees assert that the Madisons, not coming into

court with clean hands, are in no position to ask relief from the courts. A defense of equitable estoppel is thus raised, not affirmatively pled. Rule 94, T.R.C.P.

However, on grounds first above assigned, cross-appellees' motion for rehearing must be sustained, our order of affirmance set aside, and instead, that judgment of the trial court be here reversed and rendered for original appellants; except that the Madisons are entitled to withdrawal of their court deposit (actually $6,792.16), which the District Clerk is ordered to return to them, taking due receipt therefor.

Reversed and rendered.