**NORTH AMERICAN ACCEPTANCE CORPORATION, Appellant,**

v.

**Robert B. WARREN et al., Appellees.**

**No. 17415.**

Court of Civil Appeals of Texas, Dallas.

March 6, 1970.

Rehearing Denied April 3, 1970.

Ross H. Hemphill, William A. French, McCulloch, Ray, Trotti & Hemphill, Dallas, for appellant.

Edward R. Vinson, Fritz, Vinson, Merriell & Grynwald, Dallas, for appellees.

CLAUDE WILLIAMS, Justice.

Invoking the provisions of Art. 16, Sec. 11, of the Constitution of Texas, Vernon's Ann.St. and Articles 5069 and 5073, Vernon's Ann.Civ.St. of Texas, Robert B. Warren and wife brought this action against North American Acceptance Corporation, assignee of a note and lien from Beautyguard Manufacturing Company seeking to recover double the amount of alleged usurious interest and attorney's fees. Plaintiffs also alleged that the promissory note and lien securing same were void because of fraud and prayed for cancellation of such instruments.

The case was tried before the court and a jury. In response to special issues submitted the jury found that Robert B. Warren did not sign the promissory note, contract and guarantee, contract for labor and materials and trust deed, all dated December 18, 1962; that Mr. and Mrs. Warren did not personally appear before a notary public on December 18, 1962 and acknowledge that they signed the contract for labor and materials and trust deed of that date; that Beautyguard failed to quote either Mr. Warren or Mrs. Warren both a cash price and a time price on the home improvements involved; that Beautyguard failed to give either Mr. Warren or Mrs. Warren an option to select an insurance agent or an insurance company of their choice; that the reasonable market value of the home improvements made to the Warren home by Beautyguard was $1,322.-76; that a reasonable attorney's fee for services of Warren's attorney would be $1,860; and that Mr. and Mrs. Warren did not ratify the note, contract and guarantee by making the payments in full to North American Acceptance Corporation in the sum of $2,799.60.

Based upon the foregoing findings the court found in its judgment "that a 'Time Price' was not given Plaintiff and that the amount of money, viz., $1,049.60, paid by Plaintiff to North American Acceptance Corporation, over and above $1,750.00, constituted usurious interest, and the Court having made such additional * * * findings as were established by law, and being of the opinion that Plaintiffs should recover $2,099.20 for usury double damages, and $1,860.00 for attorney's fees" awarded plaintiffs judgment in the sum of $3,959.20. The court also ordered the note in question marked "Paid" and the mechanic's lien released.

Appellant North American Acceptance Corporation (hereinafter referred to as North American) appeals from said judgment and presents two points of error in which it contends that this court should reverse and render the judgment.

Appellant's first point is:

"The court erred in failing to sustain Appellant's Amended Motion for Judg-

ment Non Obstante Veredicto on the ground that Appellees failed in their burden of proof to show knowledge on the part of the Appellant that usurious interest was collected or intent on the part of Appellant to collect usurious interest."

■ Reference to both Paragraph III of appellant's amended motion for judgment *non obstante veredicto* as well as the fifth ground in appellant's motion for new trial reveals that in neither instance did appellant present the question of failure of appellees to prove intent on the part of appellant to collect usurious interest. In each instance appellant complained of the failure of the trial court to sustain its motion for judgment *non obstante veredicto* "on the ground that Plaintiffs failed in their burden of proof *to show knowledge or notice* on the part of the Defendant that usurious interest was collected." (Emphasis supplied.) Accordingly, since the question of lack of proof of intent to collect usurious interest was presented for the first time in this court, such contention as advanced in the latter part of appellant's first point must be considered waived. Rule 320, Vernon's Texas Rules of Civil Procedure.

By appellant's second point of error it asserts that the trial court erred in failing to sustain its amended motion for judgment *non obstante veredicto* on the ground that the transaction between Beautyguard and appellees was a sale of home repairs on a deferred payment plan and that any failure of Beautyguard to make disclosures was cured by appellant prior to any payment made by appellees.

Inasmuch as both points complain of refusal to grant motion for judgment *non obstante veredicto* they are "no evidence" points and must be judicially reviewed within well established rules. We have reviewed the entire statement of facts in the light of these rules and, having done so, we have concluded and so find that there is no merit to either of appellant's points of error and that same should be and are overruled.

A fair summary of the material evidence is now presented. Mr. Warren testified that he and his wife were the owners of a small home in Dallas. He is a laborer with a tenth grade education. His wife is employed as a maid and has a fourth grade education. In the latter part of 1962 a man named "Pat", representing himself to be working for Beautyguard, came to his house and talked to him and his wife about home improvements in the form of a new roof, aluminum siding, and some material for the front of the house. The salesman quoted him and his wife with a total price for this work as being $1,750 and this was the only price ever quoted. Such price was to include "interest and all." The salesman had him sign a contract with the spaces left blank for the amount of the monthly payments and the number of payments, such blanks to be filled in later, and a copy of the entire instrument to be returned to him. This was never done. The only figures he authorized the Beautyguard salesman to fill in were the amount and the number of the monthly payments so as to total $1,750. This is the only instrument he ever signed in connection with this transaction. He was shown a note dated December 18, 1962 in the sum of $2,796.60 payable to Beautyguard Manufacturing Company and payable in sixty installments of $46.66 each. He denied that the signature "Robert B. Warren" on this note was his signature. He was shown an instrument called "Contract and Guarantee" which described the work to be done and the note, and denied that the signature shown thereon "Robert B. Warren" was his signature. He was shown another instrument purporting to be a mechanic's lien covering his property and denied that the signature thereon was his signature. He never authorized his wife or anyone else to sign any of the instruments for him. He testified that he never at any time went before a notary public with his wife and acknowledged to anyone that he had signed any instrument in connection with the matter. He further said that the Beautyguard man

never even mentioned insurance to him; that he was given no choice as to an insurance company or agent; that he did not know that insurance charges were going to be included in the price and that he never signed any application for insurance. The next day when he came home from work he found that the work had been started on the home. The job was completed the next day following. A week or two later a lady from North American called him from Atlanta and told him that their company had bought the note from Beautyguard but did not tell him the amount of the note or the number or amount of the monthly payments. He advised her that he had not signed any note. During this conversation there was no discussion concerning insurance. After he received the coupon book showing how much he had to pay, $2,799.-60, he consulted an attorney who advised him that he might as well go ahead and pay it off as it would cost too much to fight the matter so he went ahead and paid off the note "so as to save his home."

Mrs. Warren testified that the only price the Beautyguard salesman ever quoted to her and her husband was $1,750; that he had them sign some kind of paper and said he would find out how much and how many the monthly payments would be and would fill them in and let them have a copy of the instrument. He never did so. The next day one of the Beautyguard men told her he had some papers for her to sign. She remonstrated that she could not sign because her husband was not there, but the man told her it was all right for her to sign for both herself and for her husband. She did so, thinking it was necessary. The man did not tell her what the papers were nor did she read them before signing. Upon being shown the note, contract and lien, at one point she said that she signed her husband's name on the note but she testified later that she did not know that these were the papers she signed. All she could say was that the signatures looked like her writing. She said she did not have her husband's permission to sign his name for him on any of the in-

struments. She said she did not acknowledge the mechanic's lien before a notary public. She related that the first time she knew that she and her husband were supposed to pay back $2,799.60 was when someone called on the telephone from Atlanta and when she was told "she blew her top." She said, "I let him know we wasn't supposed to pay that much money and he said if we didn't, it would ruin our credit." She could not recall whether insurance was mentioned in the telephone conversation.

Bruce Nolen, vice president in charge of credit for North American, testified that neither Warren nor his wife applied for insurance, and insurance was not referred to in any of the instruments purportedly signed by them. He said that in 1962 when North American purchased the "home improvement loan" from Beautyguard applications for insurance were not being made by the customers and that if there was insurance it could be "included in the contract." Two premiums charged by North American for the two policies issued to Warren totaled $209.97, same being included in the difference between $1,750 and the amount of the note, $2,799.60. The insurance was issued by Volunteer Life Insurance Company, and the president of North American was an agent for Volunteer and signed and issued the policies in Atlanta. Volunteer paid North American commissions on such insurance. He said that he telephoned the Warren residence in December 1962 and talked with a man, but admitted such person never said he was Robert B. Warren. A record was made of the conversation. In fact two records purporting to be conversations between representatives of North American in Atlanta and Mr. and Mrs. Warren were offered in evidence. The records were played before the jury but Warren denied that it was his voice. Nolen said that he told the man on the telephone that he was planning on purchasing the Beautyguard contract and that the person on the other end of the line knew the monthly payments would be $46.-66 a month and that he discussed life insurance and finance charges.

■ It is to be observed that appellant does not attack the sufficiency of the evidence to support any of the special issue findings made by the jury. The evidence is, indeed, quite sufficient to sustain each finding made. Appellant, in its first point, merely contends that appellees have failed in their burden of proving knowledge on the part of North American that usurious interest was collected. It is, of course, true that in order for appellees to recover the statutory penalty and attorney's fees pursuant to Art. 5073, V.A.C.S., as against the assignee, North American, they were required to allege and prove knowledge or notice on the part of the assignee that the interest received and collected was usurious. Fires v. Kinney-Shotts Inv. Co., 59 S.W.2d 827 (Tex.Comm'n App.1933, opinion adopted). We think that appellees have met the burden imposed upon them by law by both alleging and proving knowledge of the usurious character of the transaction, and that several reasons are apparent why appellant's contention is without merit.

■ The note, contract and lien which North American purchased from Beautyguard show by their own terms that usury was being charged. This is evident because it was shown that charges of $1,049.-66 were being made for the forbearance of $1,750 which obviously exceeds ten per cent per annum as allowed by law. The evidence reveals that the "Contract and Guarantee" which Beautyguard assigned to North American showed "$1,750" as the "unpaid cash balance," and the note was in the amount of $2,799.60. Nolen, appellant's vice president, testified that he knew that the difference between $1,750 and $2,799.60 represented charges in the note. He said he knew when the note was purchased that $209.97 of the $1,049.60 represented charges for life and accident and health insurance. It has uniformly been held that the failure of the lender to give the borrower an option to select an insurance company or agent of his choice converts the premiums into interest regardless of whether there is or is not a statutory prohibition against such conduct. Texas Finance & Thrist Ass'n v. State, 224 S.W.2d 522 (Tex.Civ.App., Dallas 1949); Rodriguez v. R. P. Youngberg Finance, 241 S.W.2d 815 (Tex.Civ.App., El Paso 1951); Ware v. Paxton, 266 S.W.2d 218 (Tex.Civ.App., Eastland 1954, writ ref'd n. r. e.).

In Associates Inv. Co. v. Sosa, 241 S.W.2d 703 (Tex.Civ.App., San Antonio 1951, writ dism'd), the same kind of transaction was involved and the same question presented. The court, speaking through Justice Norvell, said that the Associates, the assignee, was chargeable with notice of the usurious nature of the contract by the contents of the agreement itself, together with its knowledge of the amount of the insurance premium. In considering the question of assignee's liability for usury he said, inter alia: "If it is shown that a transferee may by reading the contract in the light of knowledge possessed by him (such as to amount of insurance premium in this case) and thus ascertain its usurious nature, he is charged with notice of usury. It is not necessary to show this notice 'over again' by evidence outside the written contract. Gifford v. State, Tex.Civ.App., 229 S.W.2d 949."

For other cases supporting this general proposition of law see: Associates Inv. Co. v. Baker, 221 S.W.2d 363 (Tex.Civ.App., Austin 1949, writ dism'd w. o. j.); American Surety Co. of New York v. Fenner, 133 Tex. 37, 125 S.W.2d 258 (1939); Associates Inv. Co. v. Ligon, 209 S.W.2d 218 (Tex.Civ.App., Austin 1948); Associates Inv. Co. v. Thomas, 210 S.W.2d 413 (Tex.Civ.App., Fort Worth 1948); and G. F. C. Corporation v. Williams, 231 S.W.2d 565 (Tex.Civ.App., Dallas 1950).

■ As to the question of intent on the part of appellant to collect usurious interest we have heretofore held that such issue was waived. However, even if such had been properly presented it would have been overruled. In Graham & Locke Investments Inc. v. Madison, 295 S.W.2d 234

(Tex.Civ.App., Dallas 1956), this court considered the question of intent. Justice Young, speaking for the court, said:

"But where the facts and circumstances plainly demonstrate the existence of a usurious contract, an intent to exact usury may be conclusively presumed. In determining the question of usury, all devices are disregarded and whenever the courts are satisfied that there is a charge contracted for, merely for the use of money, in excess of that allowed by law for interest, they will treat it as usurious, in whatever guise it may be shown to exist."

See also Sledge v. Murphy, 284 S.W.2d 938 (Tex.Civ.App., Waco 1955); Bexar Building & Loan Ass'n v. Seebe, 40 S.W. 875 (Tex.Civ.App., 1897); Commerce Trust Co. v. Best, 54 S.W.2d 1037 (Tex.Civ.App., Fort Worth 1932, modified on other grounds, 124 Tex. 583, 80 S.W.2d 942, (1935); Federal Mortgage Co. v. State National Bank, 254 S.W. 1002 (Tex.Civ.App., Beaumont 1923); and Joy v. Provident Loan Society, 37 S.W.2d 254 (Tex.Civ. App., Texarkana 1931). From the facts developed in this record it is quite evident that the parties involved in this assignment intended to provide for and bring about the particular results required by the legal meaning of the terms used in the instruments assigned and in which they were made parties and beneficiaries. Certainly intent, if intent be necessary, was demonstrated by the acts and conduct on the part of assignee.

Moreover, Art. 5069, V.A.C.S., expressly provides that usury is interest in excess of the amount allowed by law and that all contracts for usury are contrary to public policy and shall be void. Usurious contracts, being against public policy and void, cannot be validated by being transferred to an assignee. Appellant, claiming to be a "bona fide" purchaser of the indebtedness, must be held to have known the public policy of this state relating to interest contracts. Braniff Investment Co. v. Robertson, 124 Tex. 524, 81 S.W.2d 45 (1935); Manning v. Christian, 124 Tex. 517, 81 S.W.2d 54 (1935); Dallas Trust & Savings Bank v. Brashear, 65 S.W.2d 288 (Tex.Comm'n App.1933); and Deming Investment Co. v. Clark, 89 S.W.2d 853 (Tex.Civ.App., Waco 1935). In the early case of Gilder v. Hearne, 79 Tex. 120, 14 S.W. 1031 (1890), the court held that where the statute declares a usurious contract void, it gathers no vitality by its circulation and is void in the hands of an innocent holder.

Turning now to appellant's second point of error we find several reasons why the same is without merit. By this point appellant takes the position that the vice that caused the original obligation to involve usury was cured by North American, prior to the time Warren made any payments on the obligation, by North American advising the Warrens of the exact nature of the transaction. Appellant concedes that the question of whether or not a contract is usurious in its inception because of failure to disclose can be cured by a subsequent disclosure is an original question. It cites no authority in support thereof.

We are of the opinion that, as discussed above, since the contract was void and ineffective from the beginning the breath of life could not be breathed into it by subsequent efforts on the part of the assignee, appellant herein. The jury found that the Warrens did not ratify the note and contract by agreeing to make the payments to North American. This finding is not attacked. Finally, the facts concerning the telephone conversations through which appellant claims disclosures made to appellees are in sharp conflict. The jury and the court resolved the conflict against appellant.

Finding no reversible error reflected in this record the judgment of the trial court is, in all things, affirmed.

Affirmed.